COPY

1 │ COUGHLIN STOIA GELLER
   │ RUDMAN & ROBBINS LLP
2 │ DARREN J. ROBBINS (168593)
   │ ANDREW J. BROWN (160562)
3 │ MATTHEW I. ALPERT (238024)
   │ ERIC I. NIEHAUS (239023)
4 │ 655 West Broadway, Suite 1900
   │ San Diego, CA 92101
5 │ Telephone: 619/231-1058
   │ 619/231-7423 (fax)
6 │ darrenr@csgrr.com
   │ andrewb@csgrr.com
7 │ malpert@csgrr.com
   │ eniehaus@csgrr.com
8 │
   │ Lead Counsel for Plaintiffs
9 │
   │ [Additional counsel appear on signature page.]
10 │

FILED
CLERK, U.S. DISTRICT COURT

JUL 16 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LAURI S. BATWIN, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>OCCAM NETWORKS, INC., et al.,<br><br>Defendants. | No. 2:07-cv-02750-CAS(SHx) **(Consolidated)**<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1.     This is a class action for violation of the Federal Securities laws brought under §§11(a) and 15 of the Securities Act of 1933 (the "Securities Act"), and §§10(b), 20A and 20(a) of the Securities Exchange Act of 1934 Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").  Lead Plaintiff brings this action on behalf of a class of all persons and entities who purchased the common stock of Occam Networks, Inc. ("Occam" or the "Company") between April 29, 2004 and October 15, 2007, inclusive (the "Class Period") to recover damages caused to the Class by defendants' violations of the securities laws.  Included in the Class are all persons who obtained Occam stock pursuant to the false and misleading Registration Statement and Prospectus filed with the SEC on October 13, 2006 and deemed effective on November 7, 2006. Defendants are Occam, senior executives and directors of the Company, the Company's auditors during the Class Period, the lead underwriter in the Offering and two Venture Capital Firms who – with their large holdings of Company stock and their own partners serving on the Company's audit committee of the Board of Directors – effectively controlled the Company's accounting practices and manipulated them to their own personal benefit.

2.     As defendants have now admitted by the Company's restatement of the last three years of reported revenues, they engaged in a scheme to inflate Occam's stock price in order to enrich themselves and regain the Company's listing on a national exchange, *i.e.*, Nasdaq – thereby creating liquidity for them to sell their stock holdings and providing access to capital in order to grow the Company and increase their own wealth, power and prestige.[1]  Defendants' scheme was not complicated –

---

[1]     Defendant Thomas Weisel Partners, LLC is not alleged to have engaged in fraudulent conduct or to have participated in the fraudulent scheme perpetrated by the Occam Defendants.

1   they simply recognized revenue prematurely as a matter of course.  In fact, the
2   Company's repeated accounting violations throughout the Class Period caused its own
3   auditors to warn defendants that the Company was suffering from several "material
4   weaknesses" and "internal control deficiencies" surrounding its revenue recognition
5   and financial reporting practices.  Undaunted, defendants fired the auditor and the
6   illegal revenue recognition practices continued for years, causing the Company to
7   report ***improper revenue numbers every single quarter for three straight years***, until
8   eventually they were forced to restate the Company's reported financial results.  But
9   before the restatement, defendants were successful in their fraud and were able to cash
10  out huge sums, selling more than a million shares of stock for tens of millions of
11  dollars.

12      3.    In the early 2000s, Occam was a small, poorly capitalized
13  telecommunications company that was unable to earn a profit.  Its stock was relegated
14  to the "Over-The-Counter ("OTC"): Bulletin Board" market of the Nasdaq, trading for
15  $0.10 to $0.30 per share.  As a thinly-traded OTC stock trading for pennies, Occam
16  did not have access to the same capital markets as larger, National Exchange
17  companies.  But because it was not profitable, it needed to obtain additional sources of
18  funding over the years.  So it found the necessary capital in the private sector –
19  venture capital firms ("VCFs").

20      4.    In fact, by the beginning of 2004, two venture capital firms in particular
21  had invested so much into Occam that together they had gained a controlling interest
22  in the Company.  And each of the two firms put a managing member on Occam's
23  five-member board of directors.  Steven Krausz, managing member of the U.S.
24  Venture Partners group of funds, was the Chairman of the Board of Directors and
25  served on the Company's Audit Committee.  Robert Abbott, general partner of the
26  NorWest Venture Partners group of funds was also a director and served on the Audit
27  Committee with Krausz.  Collectively, these two firms controlled over 55% of the
28  Company's stock.

5.      But in order to get a return for their investment, these controlling funds also needed to be able to **sell** their stock.  The problem was, as stated in Occam's 2005 SEC Form 10-K:

> Trading on the OTC Bulletin Board may adversely impact our stock price and liquidity, and the ability of our stockholders to purchase and sell our shares in an orderly manner.  In particular, limited trading volumes and liquidity may mean that stockholders are unable to purchase or sell our common stock in the amounts and at the times they wish. Trading volume in the our common stock tends to be modest relative to our total outstanding shares, and the price of our common stock may fluctuate substantially (particularly in percentage terms) without regard to news about Occam or general trends in the stock market.

6.      Thus, in order to be able to get a return on their substantial investment and sell the large quantities of stock they held, the VCFs had to get the Company's stock price up and get it off the OTC Bulletin Board, and instead get it trading on the Nasdaq Global Market.

7.      The VCFs, along with the Company's top executives, began a scheme whereby the Company would demonstrate growth in revenues over a period of time to lift the stock price.  Eventually, with an inflated stock price they would get Occam listed on the Nasdaq and complete a secondary stock offering in which the VCFs would be able to sell a large portion of their holdings, and the Company would simultaneously be able to raise additional desperately needed capital.

8.      But the legitimate revenue growth the Company was going to be able to generate in the near term was insufficient.  So defendants began "pulling in" revenue into the immediate quarter that, under the accounting rules, the Company was not yet entitled to recognize.  Of course, once this illegal revenue recognition practice began, it had to continue. Because defendants were taking revenues from future quarters and recognizing it in the instant quarter, it immediately reduced the revenues for the

1  following quarter.  In order to maintain its revenue growth, the Company again had to

2  prematurely recognize revenue from the following quarter.  And so on.

3       9.      The scheme was initially successful – in part.   Throughout 2004

4  defendants were able to announce significant quarter-over-quarter and year-over-year

5  increases in revenues, which they always emphasized in their earnings releases and

6  always attributed to legitimate factors such as new customers and reduced expenses.

7  Yet the market did not initially react as planned.  Instead, throughout 2004 Occam's

8  stock price languished in the same range as the prior year.  Importantly, the Company

9  was still not profitable either.  So in early 2005 Occam was forced to do another round

10 of venture capital funding, wherein it raised an additionally $10 million by issuing

11 more stock to VCFs, and ceding more control.

12      10.     But in 2005, the telecom industry in which Occam operated began to see

13 dramatic improvement.  Buoyed by increasing sales in the industry, Occam's business

14 prospects improved and Occam continued to report increasing sales and revenues.

15 However, the legitimate revenue improvement was not sufficient enough for Occam to

16 be able to stop its illegal revenue recognition scheme.  So it continued.  Fortunately

17 for defendants, in 2005 the market began to react favorably to their continued "record

18 revenue" announcements and the stock price began improving dramatically.

19      11.     Then in late Spring, 2005, disaster nearly struck.  While completing its

20 review of the Company's financial statements, and other "internal control

21 deficiencies" the Company's auditor, PricewaterhouseCoopers ("PwC"), identified

22 "internal control" deficiencies concerning the Company's revenue recognition

23 practices.  This issue was brought to the attention of the Audit Committee and

24 discussed with the Company's top executives (Robert Howard-Anderson, the CEO

25 and Howard Bailey, the CFO).

26      12.     According to an SEC Form 8-K filed by defendants on June 28, 2005, the

27 following occurred:

28

During the Company's two most recent fiscal years ended December 31, 2003, and December 31, 2004, and through June 22, 2005, there were no reportable events (as described in Item 304(a)(1)(v) of Regulation S-K), ***Except that PwC advised the [Audit] Committee and management of the Company that PwC noted internal control deficiencies related to the following:(i) a material weakness for the failure to properly recognize revenue with respect to a certain contract recorded during the quarter ended June 30, 2004; and (ii) a significant deficiency for the failure to properly classify deferred revenue within the financial statements during the quarter ended March 31, 2005.***

***These deficiencies were discussed with the chairman of the Committee and representatives of the Company's management, as were the proposed remedial actions.*** The Company has remedied the deficiency relating to revenue recognition by filling a vacancy that existed in its finance department and by establishing new procedures to prevent future recurrences of such deficiency. The Company has remedied the deficiency relating to the deferred revenue classification by adding a deferred revenue liability account to its quarterly reconciliation accounts list.[2]

13.   ***The Audit Committee then immediately dismissed PricewaterhouseCoopers as the Company's auditor***.

14.   The Company had no immediate replacement for PwC, but a week later formally engaged Singer Lewak Greenbaum & Goldstein, LLP ("Singer Lewak") as the Company's public accountants. Singer Lewak had no prior history with the Company, but was advised of PwC's work, and was provided the opportunity to

---

[2]   All emphasis is added unless otherwise noted.

1  discuss important accounting issues with PwC, including PwC's identification of
2  internal control deficiencies and material weaknesses.

3      15.    Defendants revenue recognition scheme continued unabated into late
4  2005, and the Company's reported revenues continued to grow.  Defendants continued
5  to announce ever-increasing revenues and attribute those "record" revenues to
6  legitimate factors.  The stock price continued to react favorably.  With its stock price
7  inflated by their revenue recognition scheme, in early 2006, the Company began
8  preparations to get back onto the Nasdaq Global Market and to do a secondary
9  offering – which would allow the controlling venture capital groups to sell large
10 amounts of their stock.  First, in order to get their share price above the Nasdaq's
11 minimum, the Company had to conduct a reverse stock split.  On February 23, 2006,
12 the Company announced a 1-40 reverse stock split, which became effective as of
13 March 10, 2006.  Upon completion of the reverse split, the Company's stock began
14 trading in the range of $15-$20 per share.

15     16.    At approximately the same time, the Company filed its fiscal year ("FY")
16 2005 SEC Form 10-K.  In the SEC Form 10-K defendants again gave lip-service to
17 fixing the "internal control deficiencies," advising:

18         To address these control deficiencies, we have implemented
19     certain remedial actions, including engaging an outside consultant to
20     make recommendations and assist in the remedial process and increasing
21     the staffing of our finance department.  We continue to evaluate the
22     status of our internal controls and to take additional actions that are
23     necessary to resolve the control deficiencies identified above.

24     17.    Of course these assurances were false – defendants continued to
25 improperly recognize revenue, and would do so for every quarter thereafter until they
26 were caught.

27     18.    Defendants also continued to work toward listing on the Nasdaq.  For
28 instance, in order to comply with the Nasdaq listing requirements, its Audit

1  Committee members had to be "independent."  So in May 2006, Steven M. Krausz
2  and Robert B. Abbott were taken off the Audit Committee and placed on other
3  committees of the Board of Directors.

4      19.    And, at the same time defendants were also preparing to do the secondary
5  stock offering.  In May 2006, the Company announced that it had filed the required
6  SEC Form S-1 Registration Statement, which it amended throughout the year as
7  necessary.  It also began the process of hiring underwriters and marketing the stock
8  offering to investors to ensure there would be adequate demand.

9      20.    In October 2006, defendants efforts finally began to pay off.  On
10  October 5, 2006, the Company announced that its stock would begin trading on the
11  Nasdaq Global Market on October 9, 2006 under the new symbol "OCNW".  Eight
12  days later, defendants filed the final amendment to the Registration Statement for the
13  Offering, and the Prospectus was filed two weeks after that and incorporated into the
14  Registration Statement.

15      21.    On November 7, 2006, defendants completed the secondary stock
16  Offering in which the Company sold 3.75 million shares, while funds associated with
17  U.S. Venture Partners (Krausz) and Norwest Venture Partners (Abbott), as well as
18  other venture capital funds collectively sold 1.5 million shares, all for $14 per share.
19  A week later, funds associated with U.S. Venture Partners and Norwest Venture
20  Partners sold an additional 475,000 shares for more than $16 per share.  Together, the
21  funds associated with these two VCFs received approximately $20 million from the
22  Offering.

23      22.    But as defendants well knew, this also marked the beginning of the end
24  for defendants' revenue recognition scheme.  The venture funds no longer controlled
25  the Audit Committee and the Company's financial reporting.  More importantly, as a
26  Nasdaq listed stock, the Company would be required in 2007 to remedy its internal
27  control problems and satisfy all of the requirements of Sarbanes-Oxley, as well as
28  other Nasdaq and SEC disclosure rules.

23.     The last quarter of 2006 was the last full quarter in which defendants were able to improperly recognizing revenue.  Painfully aware of this fact, in early February 2007, with the announcement of the Company's excellent year-end results for 2006, defendants began guiding the stock price lower by reducing their projections for the Company going forward.

24.     Shortly thereafter, in the course of auditing the Company's year end financial results and in preparation of filing the Company's 2006 Form SEC 10-K, Singer Lewak was faced again with the "internal control deficiencies" and "material weaknesses" that had been frequently "observed" but never fixed.   Given the increased scrutiny and liability that the Company and its auditors would be exposed to a Nasdaq listed, Sarbanes-Oxley compliant company, Singer Lewak and the Company's Audit Committee decided that they would have to bring an end to the revenue recognition scheme and restate the past financial results once and for all.

25.     Six months later, and six months late on October 16, 2007, Occam finally filed its 2006 SEC Form 10-K.  *That filing included a restatement of all of the Company's financial results for the last three years.  The basis for the restatement was that the Company had been improperly recognizing revenue during each and every quarter going back to the beginning of 2004*.

26.     According to the Restatement, Occam admitted that defendants had caused the Company to improperly recognize revenue in each and every quarter for the years 2004, 2005 and 2006.  This caused each and every one of their financial statements to be false and misleading, and in violation of Generally Accepted Accounting Principles ("GAAP").  Of the $120 million in revenues reportedly earned during the three-year period, Occam was forced to restate $33 million, or an astounding 27% of all revenues recorded during that time.

27.     Investors were furious.  Market analysts publicly ridiculed the Company.  According to one analyst at The Motley Fool, in an article titled "*Tuesday's Worst Stocks in the World*":

- 8 -

But the biggest problem wasn't with the bottom line.  It was at the top, with revenue.  Quoting from the press release:

The Audit Committee identified errors pertaining to the ***timing of revenue recognition*** rather than the ability to collect or ultimately realize revenue.  The Audit Committee did not identify any instances where the Company recorded revenue that was not ultimately collected or realizable.

Translation: "We may have stuffed the channel, but at least it swallowed."

***Anyone else wondering whether a severe bout of indigestion is next?***

28.    It was.   While insiders made tens of millions of dollars from the defendants revenue recognition scheme, Class Period investors were not so lucky.  As defendants scheme was revealed in partial disclosures and half-truths over the summer of 2007, Occam's stock price plummeted.  Today the stock trades in the range of $3 per share, at a price similar to where it traded before the fraudulent scheme began. The chart below illustrates the story.

**Occam Networks, Inc.**
January 2, 2002 - November 14, 2007

JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to §§11(a) and 15 of the Securities Act, 15 U.S.C. §§77k(a) and 77o; §§10(b), 20A and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by and venue is proper pursuant to §22(a) of the Securities Act and §27 of the Exchange Act.

THE PARTIES

30.     Lead Plaintiff NECA-IBEW Pension Fund (The Decatur Plan) (hereafter "plaintiff") purchased Occam common stock as detailed in the Certification of Named Plaintiff attached to plaintiff's motion for appointment of lead plaintiff submitted to the Court on June 25, 2007 and was damaged thereby.  Plaintiff was appointed by this Court as Lead Plaintiff on July 30, 2007.

31.     Defendant Occam Networks, Inc. (hereafter "Occam" or the "Company") is a Delaware corporation with its principal executive offices located at 77 Robin Hill

- 10 -

1    Road, Santa Barbara, California.  According to Occam's most recent SEC Form 10-K

2    "We develop, market and support innovative broadband access products designed to

3    enable telecom service providers to offer bundled voice, video and data, or Triple

4    Play, services over both copper and fiber optic networks."  Occam's common stock

5    now trades on Nasdaq Global Market under the symbol "OCNW."  At the beginning

6    of and throughout much of the Class Period, it traded on the Nasdaq's over-the-

7    counter bulletin board market under the symbol OCCM.

8         32.    Defendant Robert L. Howard-Anderson ("Howard-Anderson") was

9    President and Chief Executive Officer of Occam throughout the Class Period.  During

10   the Class Period, he signed the annual reports on SEC Form 10-K for the FY 2004, FY

11   2005 and FY 2006 and signed certifications pursuant to the Sarbanes-Oxley Act of

12   2002.  Defendant Howard-Anderson also signed the Amended Registration Statement

13   on Form S-l/A filed with the SEC on October 13, 2006 for the Offering.

14        33.    Defendant Christopher B. Farrell ("Farrell") was Occam's Chief

15   Financial Officer from January 2006 through the end of the Class Period.[3]  During the

16   Class Period, he signed the Company's quarterly reports for the periods ended

17   March 26, June 25 and September 24, 2006 and signed certifications pursuant to the

18   Sarbanes-Oxley Act of 2002.  Defendant Farrell signed the annual reports on SEC

19   Form 10-K for the FY 2005 and FY 2006.  Defendant Farrell also signed the

20   Amended Registration Statement on Form S-l/A filed with the SEC on October 13,

21   2006 for the Offering.

22        34.    Defendant Howard Bailey ("Bailey") was Occam's Chief Financial

23   Officer from June 2002 to January 2006.  During the Class Period, he signed the

24   Company's quarterly reports for the periods ending in March, June and September of

25   2004 and 2005, and the annual report on SEC Form 10-K for FY 2004.  Defendant

26   _____

27   [3]    Farrell joined Occam in June 2005 as Director of Finance.

28

1  Bailey also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 for each

2  quarterly report in 2004 and 2005, and for the annual report on SEC Form 10-K for

3  2004.

4       35.     Defendant Steven M. Krausz ("Krausz") has served as an Occam

5  Director from the Company's inception in 1997 through the end of the Class Period.

6  Defendant Krausz was Chairman of the Board and served on Occam's Audit

7  Committee in 2004, 2005 and through May 2006.  Defendant Krausz signed the

8  annual reports on SEC Form 10-K for the FY 2004 and FY 2005.  Defendant Krausz

9  also signed the Amended Registration Statement on Form S-1/A filed with the SEC on

10  October 13, 2006 for the Offering.  Defendant Krausz is a managing member of and

11  an investor in funds associated with U.S. Venture Partners, a venture capital firm

12  comprised of numerous funds, which collectively made it the single largest

13  shareholder of Occam common stock and Series A-2 preferred stock during the Class

14  Period and a seller in Occam's November 2006 Offering.  Krausz was controlled by

15  the USVP Funds for purposes of managing USVP Funds' investment in Occam.

16       36.     Defendant Robert B. Abbott ("Abbott") has served as an Occam Director

17  from 2002 through the end of the Class Period.  Defendant Abbott served on Occam's

18  Audit Committee in 2004, 2005 and through May 2006.  Defendant Abbott signed the

19  annual reports on SEC Form 10-K for the FY 2004 and FY 2005.  Defendant Abbott

20  also signed the Amended Registration Statement on Form S-1/A filed with the SEC on

21  October 13, 2006 for the Offering.  Defendant Abbott is a general partner of and an

22  investor in funds associated with the venture capital firm Norwest Venture Partners,

23  which is comprised of numerous venture capital funds that were large shareholders of

24  Occam common and Series A-2 preferred stock during the Class Period and a seller in

25  Occam's November 2006 Offering.  Abbott was controlled by the NVP Funds for

26  purposes of managing the NVP Fund's investment in Occam.

27       37.     Defendant PricewaterhouseCoopers LLP ("PwC") served as Occam's

28  independent registered public accounting firm from before 2003 through the first half

1   of 2005, until they were dismissed by the Company in June, 2005.  For Occam's 2004

2   annual report on SEC Form 10-K, defendant PwC audited Occam's financial

3   statements for 2004 and certified that those financials were prepared in accordance

4   with US GAAP.  The 2004 certified financial statements were also incorporated into

5   the Amended Registration Statement on Form S-1/A filed with the SEC on

6   October 13, 2006 for the Offering with PwC's permission.   Additionally, PwC

7   reviewed and signed-off on Occam's quarterly financial results and SEC Form 10-Qs

8   for Q1 and Q2 of 2005, and for all four quarters of 2004.

9        38.     Defendant Singer Lewak Greenbaum & Goldstein LLP ("Singer Lewak")

10   served as Occam's independent registered public accounting firm during the period

11   June 28, 2005 to present.  Singer Lewak was hired as the Company's public auditor in

12   replacement of PwC, who was dismissed by the Company in June 2005.  For Occam's

13   2005 annual report on SEC Form 10-K, defendant Singer Lewak audited Occam's

14   financial statements for 2005 and certified that those financials were prepared in

15   accordance with US GAAP.   The certified 2005 financial statements were

16   incorporated with Singer Lewak's permission into the Amended Registration

17   Statement on Form S-1/A, filed with the SEC on October 13, 2006 for the Offering.

18   Singer Lewak also reviewed and signed-off on Occam's quarterly financial results and

19   SEC Form 10-Qs for the last two quarters of 2005 and all four quarters of 2006.

20        39.     Defendant Thomas Weisel Partners, LLC acted as the Lead Underwriter

21   in Occam's November Offering, and received the lion's share of the $3.7 million in

22   underwriting fees and commissions for its work.   Thomas Weisel Partners was

23   responsible for conducting a reasonable due diligence review of Occam and its

24   business prior to the Offering.  Thomas Weisel Partners is liable for its own acts under

25   §11 of the Securities Act.

26        40.     Defendant U.S. Venture Partners is a venture capital firm comprised of

27   numerous funds.  This VCF is comprised of numerous "families of funds" (herein

28   collectively referred to as the "USVP Funds").  Many of these "families of funds"

were shareholders in Occam during the relevant period.  For example, according to Occam's SEC Form S-1/A filed on October 13, 2006, the following "families of funds" were Occam shareholders: (a) 258,160 shares held by U.S. Venture Partners V, L.P.; (b) 14,341 shares held by USVP V International, L.P.; (c) 8,032 shares held by 2180 Associates Fund V, L.P.; (d) 6,311 shares held by USVP V Entrepreneur Partners, L.P.; (e) 1,756,789 shares held by U.S. Venture Partners VII, L.P.; (f) 36,600 shares held by 2180 Associates Fund VII, L.P.; (g) 18,299 shares held by USVP Entrepreneur VII-A L.P.; (h) 18,299 shares held by USVP Entrepreneur VII-B L.P.[4] According to its website, since its inception in 1981, the USVP Funds have invested more than $1.8 billion in over 350 companies.  These investment interests include components, software, systems services and life sciences.  The USVP Funds were significant shareholder(s) of Occam stock during the Class Period.  Throughout the Class Period, the USVP Funds were Occam's single largest shareholder, owning more than 35% of the stock.  At the time of Occam's Offering in November 2006, these funds sold 690,000 shares of Occam stock in the offering to the investing public, and then sold an additional 345,000 shares immediately thereafter.  All told, the USVP Funds obtained proceeds from the sales of its Occam stock of more than $13 million.  One of Occam's directors, defendant Krausz, serves as a general partner of these funds and owes fiduciary duties to these funds, their partners and their investors.

41.    Defendant Norwest Venture Partners is a venture capital firm comprised of numerous funds.  Like USVP Funds, this VCF is comprised of numerous "families of funds" (herein collectively referred to as the "NVP Funds").  Many of these "families of funds" were shareholders in Occam during the relevant period.  For

---

[4]    As for Series A-2 preferred stock, the list includes: (a) 1,224,000 shares held by USVP VII; (b) 25,500 shares held by 2180 VII; (c) 12, 750 shares held by EP VII-A; (d) 12,750 shares held by EP VII-B; (e) 104,319 shares held by USVP V; (f) 5,796 shares held by V Int'l; (g) 3,245 shares held by 2180 V; and (h) 2,550 shares held by EP V.  2006 Form S-1/A (Amendment #2) at 78.

example, according to Occam's SEC Form S-1/A filed on October 13, 2006, the following "families of funds" were Occam shareholders: (a) 921,819 shares held by Norwest Venture Partners VIII L.P.; and (b) 45,781 shares held by NVP Entrepreneurs Fund VIII L.P.[5]  According to its website, the NVP Funds manage more than $2.5 billion in venture capital and have funded over 400 companies since inception over 45 years ago.  The firm's investment focus is on semiconductors, software, services consumer internet and media.  The NVP Funds were a significant shareholder of Occam stock during the Class Period.  Throughout the Class Period, NVP Funds were Occam's second largest shareholder, owning more than 15% of the stock.  At the time of Occam's Offering in November 2006, the NVP Funds sold 320,000 shares of Occam stock in the offering to the investing public, and an additional 128,000 shares the following week.  In total, the NVP Funds obtained more than $5 million from sales of Occam stock.  One of Occam's directors, defendant Abbott, serves as general partner of these funds and owes fiduciary duties to these funds, their partners, and their investors.

**The Audit Committee of Occam's Board of Directors**

42.    Defendants Krausz and Abbott comprised the Audit Committee in the beginning of 2004.  In September 2004, Bylin was added to the Board and took a seat on the Audit Committee.  But because of their history and relationships with the Company's top executives, and the substantial investments and control exercised through the USVP and NVP Funds (hereinafter collectively, "VCFs"), Krausz and Abbott continued to dominate and control the Audit Committee while they remained on it through May 2006.  According to Occam's Amended 2005 SEC Form 10-K:

---

[5]    As for Series A-2 preferred stock, the list includes: (a) 622,283 shares held by NVP VIII and (b) 30,917 shares held by NVP EF VII.  2006 Form S-1/A (Amendment #2) at 78.

1  Our audit committee was established in accordance with Section

2  3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the

3  "Exchange Act").   Our audit committee is primarily responsible for

4  selecting our independent registered public accounting firm, overseeing

5  our internal financial reporting and accounting controls and consulting

6  with and reviewing the services provided by our independent registered

7  public accounting firm.

8  43.   As a result of Krausz's fiduciary duties owed to, and personal financial

9  interest in the USVP Funds, Krausz was hopelessly conflicted and violated his

10  fiduciary obligations to Occam and its shareholders.   More specifically, during the

11  Class Period Krausz was Occam's Chairman of the Board of Directors, and sat on

12  Occam's Audit Committee and Occam's Nominating and Governance Committee.   In

13  his role on Occam's Board, especially as a member of the Audit Committee, Krausz

14  was privy to inside, material, non-public information concerning Occam's true

15  financial condition and its important accounting practices, including revenue

16  recognition practices and internal controls.   As a board member and steward of the

17  Company, he owed Occam and its shareholders the utmost fiduciary duties of due care

18  and loyalty.

19  44.   But defendant Krausz was also a managing member and significant

20  investor in USVP Funds.   At the time of Occam's November 2006 Offering, these

21  funds beneficially owned *28.9% of all Occam common shares* and *37.0% of all*

22  *Series A-2 Preferred shares* – giving the USVP Funds effective control over the

23  Company as Occam's single largest shareholder.   Krausz violated his fiduciary duties

24  to Occam and its shareholders when he manipulated the Company's accounting

25  practices, reported financial results, and public filings, and then sold on behalf of these

26  funds over one million shares of Occam stock while in possession of material non-

27  public information in and immediately following the November 2006 Offering, *for*

28  *proceeds totaling more than $13 million*.

- 16 -

45.     Defendant Abbott was similarly conflicted.  He had been a member of Occam's Board of Directors since 2002 and also sat on Occam's Audit Committee throughout the Class Period.  In his fiduciary role as an Occam Board member he owed Occam and its shareholders the same fiduciary obligations as Krausz, and he was privy to the same material non-public information about the Company's true financial condition, including its important accounting practices, revenue recognition and internal controls.

46.     But Abbott was also a General Partner and significant investor in the NVP Funds.  At the time of Occam's November 2006 Offering, these funds beneficially owned *13.2% of all Occam common shares* and *17.4% of all Series A-2 Preferred shares*.  Abbott violated his fiduciary duties to Occam and its shareholders when he manipulated the Company's accounting practices, reported financial results, and public filings and then caused the NVP Funds to sell 320,000 shares to the investing public pursuant to the false and misleading Registration Statement, for proceeds exceeding *$4 million*.  Then a week later, he caused the funds to sell an additional 128,000 shares for more than $1 million in proceeds.

47.     The individuals named as defendants in ¶¶32-36 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company and their holdings in Occam stock, possessed the power and authority to control the contents of Occam's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions, ability to control the Company's conduct, and access to material non-public information concerning the Company, each of these defendants knew that the adverse facts specified herein had

1 | not been disclosed to and were being concealed from the public and that the positive

2 | representations which were being made were thereby materially false and misleading.

3 | **BACKGROUND**

4 | 48.    Occam is a child of the internet craze and the telecom stock market

5 | bubble. Founded in 1996 as Accelerated Networks, Inc., it originally went public in

6 | June 2000 – at the very height of the internet and telecom bubble. Like many of the

7 | companies that went public during that time, it generated little by way of revenues, yet

8 | its stock price immediately soared on the wings of the promise of the digital age and

9 | the greed of the market participants. Only months later, its stock price came back to

10 | earth with a thud, as market sentiment turned and investors returned to valuing

11 | publicly-traded companies based upon more traditional measures – such as revenues,

12 | earnings and real prospects for growth.

13 | 49.    The years that immediately followed for Occam were difficult, to say the

14 | least. The Company suffered the slings and arrows of an unforgiving, bottom-line

15 | oriented market. Shortly after its stock price crashed to earth, its business prospects

16 | dried up along with the rest of the telecom industry. And the Company shrank

17 | substantially by every measure – revenues, earnings, number of employees and market

18 | cap.

19 | 50.    During 2001 through 2003 the Company struggled to survive. In May

20 | 2002, it merged with Occam and took the latter's name. Nevertheless, in July that

21 | same year, it was delisted by the Nasdaq Global Market and forced to trade on the

22 | Nasdaq's "OTC Bulletin Board" market where it languished until 2006, when it

23 | completed a 1-for-40 reverse split of its common stock. Indeed, in 2003 and then

24 | again in 2004, its public auditor PwC issued "going concern" opinions – calling into

25 | question the Company's very existence.

26 | 51.    Not surprisingly, as evidenced by the chart below, the Company's stock

27 | price did not fair well during the years leading up to the Class Period.

28 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



Occam Networks, Inc.
June 23, 2000 - December 31, 2003

18    52.   Occam's chief problem was – and remains today – that it has not been

19  profitable.  In fact, ***it has lost money every year since its beginning***.  As a direct

20  result, defendants and the Company have been frequently required to seek sources of

21  capital and funding to maintain the Company's operations.  Just recently, after

22  regaining its listing on the Nasdaq Global Market, Occam has found that capital in the

23  public securities markets.  In November 2006, Occam and certain selling defendants

24  issued stock in an Offering to the market that raised $48.3 million for the Company.

25    53.   But until 2006, Occam and defendants had been forced to find capital

26  from alternative sources – mainly private venture capital funds.  During the years

27  before the beginning of the Class Period, Occam issued huge amounts of stock to

28  several venture capital funds – thereby effectively ceding control of the Company to

those entities and putting their general partners on Occam's Board of Directors.  In exchange for their investments, these VCFs received super-voting "Series A-2 Preferred" stock.  Before Occam's 2006 reverse stock split, each share of Series A-2 Preferred stock was convertible to 90.9 shares of common stock and, importantly, could be voted in the same ratio.

54.    Two VCFs – the two single largest investors in the Company – were permitted to put a Board member on what was then Occam's five member Board of Directors.[6]  In fact, the controlling members of each of the two VCFs, defendants Krausz and Abbott, both served on Occam's Audit Committee until mid-2006.  Thus, at the beginning of the Class Period, these VCFs, through their two board members and their control of the voting stock, effectively controlled Occam, and were able to manipulate it to their advantage.  During the first year of the Class Period, their control increased as these funds invested further in the Company – always receiving super-voting "Series A-2" preferred stock for their investments.

55.    For example, in November 2003, Occam announced that it was pursuing another round of investments from venture capital groups, who were already well invested in Occam and had a close relationship with its executives and board members through those substantial investments.  That round of funding was completed on April 1, 2004, with the announcement by Occam on April 2, 2004 that:

> it has concluded its private placement of Series A-2 Preferred Stock.  At the final closing on April 1, 2004, *investment funds associated with U.S. Venture Partners (USVP) and Norwest Venture Partners invested an additional $1.5 million.  Since November 2003, Occam has raised $22.2 million through private placements of Series 2-A Preferred Stock*.  The Series A-2 Preferred Stock sold to USVP and Norwest was

---

[6]    A third fund, Alta Partners, was also permitted to put a member on the Board but elected not to do so.

- 20 -

issued on the same terms and conditions, including pricing, as previously disclosed in Occam's Current Reports on Form 8-K filed with the Securities and Exchange Commission on November 21, 2003 and on March 12, 2004.

*      *      *

Occam previously disclosed that it issued warrants to Alta Partners to acquire up to $3.8 million of Series A-2 Preferred, subject to various conditions, including potential reductions in the $3.8 million based on Occam's ability to obtain additional financing.  As a result of the $1.5 million investment from USVP and  Norwest, the amount currently subject to the Alta warrants has been reduced to approximately $2.3 million.

56.     At the conclusion of these investments by various venture capital funds, ***Occam Board Members Krausz and Abbott controlled the Company through their partnerships with the USVP and NVP Funds***.  According to Institutional Shareholder Services – which conducted a "proxy analysis" on the Company in the Spring of 2004:

The company has two types of voting stock: common stock and Series A-2 preferred stock.  Each share of common stock is entitled to one vote and each share of Series A-2 preferred stock is entitled to 90.9 votes.  As of April 1, 2004, all officers and directors as a group beneficially owned 73.2 percent of the company's common stock, assuming conversion of the Series A-2 preferred stock into common stock at the rate of 90.9 common shares per preferred share. ***Included in this amount are Steven M. Krausz's and Robert B. Abbott's respective beneficial ownerships of 41.1 and 15.1 percent of the company's fully-diluted common shares***.

57.     But it was not enough for these VCFs to have effective control of the Company – for they also needed a way to ***profit*** from their investment.  In order to do

- 21 -

1  that, they needed to be able to **sell** their large holdings at some point in the future

2  when the stock price was much higher.

3  <center>**DEFENDANTS' FRAUDULENT SCHEME**</center>

4      58.    In order to sell their substantial holdings in the Company at a profit, two

5  things had to happen: **first**, the Company's stock had to be trading at a price higher

6  than what they paid for it; **second**, because their holdings were so large and the stock

7  was trading on the OTC: Bulletin Board, there was insufficient liquidity for the market

8  to absorb a large sale of shares.  So defendants determined that the Company needed

9  to get re-listed on the Nasdaq.  Defendants Krausz and Abbott, with the knowledge

10  and assistance of the Company's top executives, engaged in a scheme to do just that.

11      59.    To get the stock price higher, defendants began doing what they could to

12  show the market that the Company was dramatically increasing its sales and revenues.

13  It began in the first quarter of 2004 by "pulling in" revenue into the current quarter –

14  revenue that, for various reasons, the Company was not yet permitted to recognize

15  under GAAP.  By prematurely recognizing future revenues, defendants gave a boost

16  to the revenues reported in the current quarter.  For example, in reporting the

17  Company's results for the first quarter 2004 ("1Q04") defendants caused the

18  Company to overstate its revenues by $804,000, or by 33% for the quarter by

19  prematurely recognizing revenue in violation of GAAP.

20      60.    But once defendants had prematurely recognized revenue in that first

21  quarter, they had to continue doing it because a portion of the legitimate revenues

22  from the following quarter already had been applied to the earlier quarter.  Thus, at the

23  beginning of the second quarter 2004 ("2Q04"), the Company was already in the hole

24  by as much as $804,000 in revenues.  As set forth in greater detail below, defendants

25  continued in this manner each quarter thereafter, causing the Company to prematurely

26  recognize revenue every quarter for three years, until they got caught.

27      61.    As the Company's top executives and Audit Committee members, the

28  scheme was relatively simple to carry out.  The Company was small, consisting of

<center>- 22 -</center>

1  approximately 80 to 100 employees throughout the entire Class Period.  The vast

2  majority of these employees were on sales and engineering.  And these defendants in

3  particular controlled the Company, including its accounting practices, earnings

4  announcements and SEC filings.  According to the Company's 2004 10-K, of the 87

5  employees as of March 1, 2004 only 10 of the Company's employees worked in

6  "finance and administration," including the CEO and CFO.

7  **Defendants Controlled Sales and Revenues at Occam**

8      62.    Leading up to and throughout the Class Period, defendants CEO Howard-

9  Anderson and CFO Bailey (and, later CFO Farrell) were extremely involved with the

10  sales group, and in determining when the Company would receive revenues from a

11  sale.  More often than not, Howard-Anderson would get personally involved in trying

12  to close a deal in order to book the revenue.

13      63.    For example, according to one of the Company's former regional

14  directors of sales, who was employed at the Company from 2003 through mid-2005,

15  Howard-Anderson was intimately involved in sales and customer relationships.  "'I

16  could make a call and get Bob Howard-Anderson to get on a plane and see a customer

17  if it was a good account,'" according to this witness.

18      64.    But this witness also saw and felt intense pressure from Howard-

19  Anderson, Bailey, and other executives to close deals – and do so before quarter end.

20  "'It was extremely high pressure.'"  Occam's sales people were paid on a quarterly

21  basis, and they were paid even if they only "booked" the order before the end of the

22  quarter.  "'***I was paid on booking an order, it did not have to ship.  Did I move***

23  ***orders up a couple of weeks? Sure.  There was always a push to pull orders in***.'"

24      65.    Other former employee witnesses corroborate the regional sales director,

25  and offer more details of Howard-Anderson's involvement in the sales and revenues

26  aspects of Occam's business.  For example, according to a former sales vice president

27  who joined the Company in the middle of 2006 and remained for approximately a

28  year, Howard-Anderson "'was very much involved with customers.  He is the kind of

- 23 -

1  CEO who talks to the customers that they have, and jumps on a plane to go out and
2  meet with customers.  They knew him well and on an informal basis.'"

3       66.    According to this witness, Howard-Anderson was involved in
4  "'everything I was working on,'" including helping the witness in developing client
5  "'strategies, next steps and board support.'"  When it came time to close on deals,
6  Howard-Anderson and (then CFO) Farrell were also intimately involved.  In fact, ***the***
7  ***Company's policy was to get those two involved in every deal valued over $250,000.***
8  ***"'They were part of the discussion and involved in all deals more than $250,000,'"***
9  ***and "'most deals at Occam are over that'" amount***.

10       67.    In order to keep their fingers on the Company's revenue pulse,
11  defendants also put substantial procedures in place at the Company that enabled them
12  to track on a weekly basis everything that the sales staff was doing.

13       68.    According to both witnesses, since before the beginning of the Class
14  Period, every Friday the sales staff was required to fill out a report to set out the
15  details of all of their activity for the week.  Specifically, it is a report using CRM
16  software, similar to an excel spreadsheet and included information such as: all
17  identified sales opportunities, client contact information, "build strategies",
18  information on contract closings and number of units sold.  These reports were then
19  provided to Company executives, including the CEO, CFO and VP of Sales and
20  Marketing, Russ Sharer ("Sharer").

21       69.    The reports were then discussed on a weekly conference call the
22  following Monday.  Every Monday at 8 a.m. the entire sales force was required to
23  participate in a conference call with Howard-Anderson, Bailey (later Farrell), and
24  Sharer.  Various support staff would also participate when needed.  Attendance was
25  mandatory unless one was traveling.  The purpose of the call was to "talk about deals"
26  based on the information submitted the previous Friday.  According to the former VP
27  of sales, "'We'd go down the list of accounts starting with the bigger deals and be
28  prepared to talk about them.  We had to give the status of all our opportunities.'"  The

executives would ask questions about specific opportunities, and the sales team "'would ask for help if need be'" to close the deal.

70.     Each person in sales at Occam had a published goal or quota that had to be met for the year.  Each year the goals were set by Sharer, with input from Howard-Anderson and others, and provided to each salesperson.  It was broken out by quarter.  According to the former regional director, These goals were discussed at Occam's quarterly sales meetings, which were held at Occam's headquarters and lasted a couple days.  During these meetings, each member of the sales team was asked by Howard-Anderson "'to explain to us why you should keep your job.'"  According to this witness, each salesperson was required to make a presentation which included what they were seeing in their markets and "'how we were going to meet our published goals.'"

71.     Importantly, according the former VP, Howard-Anderson and the CFO were also involved in determining what compensation each sales person would receive for the quarter, based on their success at generating revenues.  For the quarter-end, Occam's CFO prepared "'quarterly roll-up'" reports for each sales member that tracked "'contributions, margins, revenue, and costs.'"  These reports were then used to calculate individual compensation for the quarter.  These compensation reports were created by the CFO and then sent to Howard-Anderson and others for review and approval.  Once approved, the CFO would send the reports to the individual sales people.

72.     Apart from the sales force, the Company's executives also met among themselves on a weekly basis to discuss important deals and the revenue outlook for the Company.  According to a former senior person within the Company, who worked there from 2000 through the end of the class period and worked closely with Howard-Anderson and other executives, the Company's senior executives held a weekly meeting referred to as GYAT – Get Your Act Together.  At these meetings, which were attended by Howard-Anderson, the CFO, Sharer at times, and at times former

1    VP of sales Marc Johnson, the executives would review significant deals and the

2    revenue outlook for the Company.

3            73.     In this manner, defendants Howard-Anderson, Bailey and Farrell were

4    able to keep close tabs on the Company's revenue stream, and had the ability to know

5    when and by how much the Company would be able to report revenue growth each

6    quarter.  Moreover, these defendants' obsession with revenues during the Class Period

7    demonstrates their knowledge of the Company's revenue recognition practices,

8    including its internal processes and controls for reporting its financial results to the

9    market.  Based on the above, these defendants clearly knew, or were reckless in not

10   knowing, that the Company was continually and significantly violating basic revenue

11   recognition rules.

12   **Defendants Improperly Recognize Revenue Every Quarter for Three Years**

13           74.     Throughout 2004, defendants caused the Company to prematurely

14   recognize revenue each quarter and for the year end.  This allowed defendants to issue

15   press releases and report financial results that were extremely positive, in an effort to

16   pump up the stock price.  For example, for third quarter 2004 ("3Q04"), defendants

17   issued a press release October 27, 2004 announcing "revenue for the quarter of $4.5

18   million, an increase of $3.0 million over the $1.5 million reported for Q3 2003.

19   Revenues for Q3 2004 set a new record and represented a 205 percent increase over

20   the same period last year."  ***In truth, and as admitted later in the Company's***

21   ***Restatement, the reported revenues for 3Q04 were overstated by $1.157 million, or***

22   ***37%***.

23           75.     In spite of the fantastic growth in reported revenues, in 2004 the stock

24   price did not react as defendants had hoped.  Instead, it continued to languish in the

25   $0.10 - $0.30 per share range that it had traded in during 2003.  And while the

26   Company's losses appeared to be declining, Occam still operated at a loss for 2004.

27   Thus by the year end 2004, defendants found themselves again in desperate need of

28   operating capital.

76.     In January 2005, Occam was forced to raise an additional $5.6 million by issuing more Series A-2 preferred stock, and then raised another $4.9 million in March 2005 in the same manner.  Not surprisingly, the USVP and NVP Funds were the two largest investors.  In so doing, the VCFs increased their control over Occam's business but also increased their stake in the Company, thereby increasing the urgency to get the Company trading on the Nasdaq so they could sell their stock.  According to the Company's SEC Form 8-K filed after the January stock sale, the USVP and NVP Funds combined to own 68% of the Company's stock.

77.     Then in the Spring of 2005, as the Company's auditor was conducting its audit of the Company's annual results for filing the 2004 SEC Form 10-K when it notified defendants of several internal control deficiencies and "material weaknesses," all surrounding the Company's revenue recognition practices and financial reporting, dating back to 2Q04.  According to the Company's 2005 SEC Form 10-K, filed in 2006:

>   During the course of preparation of Occam's 2005 year-end quarterly financial statements, Occam's management and independent registered public accounting firm identified internal control deficiencies that could be deemed to be "material weaknesses" or "significant deficiencies" if Section 404 of the Sarbanes-Oxley Act were currently applicable to Occam.  Neither Occam's management nor its independent auditors has concluded that any of these control deficiencies in fact constitute "material weaknesses" but believes it likely that one or more could be deemed a material weakness.  An internal control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.  A "material weakness" is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material

misstatement of the annual or interim financial statements will not be prevented or detected.  A "significant deficiency" is a control deficiency, or combination of control deficiencies, that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with accounting principles generally accepted in the United States of America.  In the case of a significant deficiency, a more-than-remote likelihood exists of a misstatement of the company's annual or interim financial statements that is more than inconsequential.

> ***Occam's identified control deficiencies relate to (i) the documentation, assessment, and testing of key controls over financial processes, including revenue recognition; (ii) limitations in financial staffing, with related inadequacies in segregation of duties; (iii) processes for preparation and review of SEC filings, press releases and review of financial schedules; and (iv) the documentation and review of the basis of, support for, and considerations surrounding significant accounting estimates.***

78.   Of course, these material weaknesses and internal control deficiencies were immediately brought to the attention of Occam's Audit Committee and CEO and CFO.  As reported in an SEC Form 8-K filed on June 28, 2005:

> During the Company's two most recent fiscal years ended December 31, 2003 and December 31, 2004, and through June 22, 2005, there were no reportable events (as described in Item 304(a)(1)(v) of Regulation S-K), except that ***PwC advised the Committee and management of the Company*** that PwC noted internal control deficiencies related to the following: (i) a material weakness for the failure to properly recognize revenue with respect to a certain contract recorded during the quarter ended June 30, 2004; and (ii) a significant

1   deficiency for the failure to properly classify deferred revenue within the

2   financial statements during the quarter ended March 31, 2005.  ***These***

3   ***deficiencies were discussed with the chairman of the Committee and***

4   ***representatives of the Company's management, as were the proposed***

5   ***remedial actions***.

6   79.    And while defendants also claimed to have taken steps to remedy the

7   problems in that same SEC Form 8-K, these steps were a whitewash designed to give

8   them plausible deniability, and to permit defendants to continue violating GAAP and

9   prematurely recognizing revenue.

10   80.    ***In fact, these defendants immediately dismissed PwC after it pointed***

11   ***out the Company's internal control deficiencies, even though the Company did not***

12   ***yet have a replacement***.  According to that same June 28, 2005 SEC Form 8-K:

13         On June 22, 2005, the Audit Committee (the "Committee") of the

14         Board of Directors of Occam Networks, Inc. (the "Company") dismissed

15         PricewaterhouseCoopers LLP ("PwC") as its independent registered

16         public accounting firm.

17         The Committee has authorized the Company to engage Singer

18         Lewak Greenbaum & Goldstein LLP ("SLGG") as the Company's new

19         independent registered public accounting firm, but the Company has not

20         yet entered into a formal engagement letter with SLGG.

21   81.    Defendants were thereby free to continue their revenue recognition

22   scheme unabated.  And they did.

23   82.    As the telecommunications market improved in 2005, so did Occam's

24   business prospects.  But they never improved so much that Occam could stop pulling

25   in revenue from future quarters.  Thus, as Occam would later admit in its Restatement,

26   the Company continued to prematurely recognize revenue each and every quarter of

27   2005, in violation of GAAP.

28

- 29 -

83.     But finally in 2005, the market began to take notice of Occam's reported results.  Occam's stock price increased dramatically in 2005, in response to defendants continual earnings announcements of "record revenue growth."  For example, on May 18, 2005, the Company issued its press release announcing its "record" revenues for first quarter 2005 ("1Q05"), titled "***Occam Networks Reports Record Revenues in Q1 2005; Company Achieves Record Revenue and Double-Digit New Customer Growth for Third Consecutive Quarter***."  Over the next two trading days the stock traded up almost 19%.  Yet again, according to the Company's own Restatement, the revenues for that quarter were overstated by $312,000, or by 5%, thereby understating the loss for the quarter by 7%.

84.     But by the end of 2005, the Company had established a history of reporting "record" revenues and the stock price remained artificially inflated by defendants repeated false and misleading statements.  So in early 2006, defendants began taking the necessary steps to get the Company relisted on the Nasdaq Global Market.

85.     First, in order to achieve a stock price above the Nasdaq's minimum, the Company had to complete a reverse stock split.  On February 23, 2006, the Company announced it would complete a reverse 1 for 40 split, to be effective as of March 10, 2006.   Next, the Company had to satisfy Nasdaq and SEC requirements for Audit Committee "independence."  So in May 2006, the Company removed Krausz and Abbott from the Audit Committee and added Cole and Strom.

86.     Yet defendants also remained mindful of the prior "internal control deficiencies" report they had received during 2005 from their old auditors.  In an effort to allay any investor fear that the Company may still suffer from such problems, and to further conceal their revenue recognition scheme as they made preparations to be listed on the Nasdaq, defendants gave the following false assurances in the FY 2005 SEC Form 10-K (filed on March 30, 2006):

*(a) Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this report, under the supervision and with the participation of Occam's management, including Occam's Chief Executive Officer and Chief Financial Officer, management evaluated the effectiveness of Occam's disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Occam's disclosure controls and procedures were effective as of December 31, 2005***.

In making their assessment concerning the effectiveness of Occam's disclosure controls and procedures as of December 31, 2005, management considered the internal control deficiencies described below. ***In light of the deficiencies described below, Occam's management performed additional analysis and other post-closing procedures to ensure that its financial statements are prepared in accordance with generally accepted accounting principles. Management believes that the financial statements included in this report fairly present in all material respects Occam's financial condition, results of operations, and cash flows for the periods presented. In addition, management believes that remediation efforts put in place to date, including the implementation of a disclosure committee and more active managerial involvement in the preparation of SEC filings, are effective to ensure that information required to be disclosed by Occam in its periodic reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***.

\*     \*     \*

During the course of preparation of Occam's 2005 year-end and quarterly financial statement, Occam's management and independent registered public accounting firm identified internal control deficiencies that could be deemed to be "material weaknesses" or "significant deficiencies" if Section 404 of the Sarbanes-Oxley Act were currently applicable to Occam.  Neither Occam's management nor its independent auditors has concluded that any of these control deficiencies in fact constitute "material weaknesses" but believes it likely that one or more could be deemed a material weakness.  An internal control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A "material weakness" is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.  A "significant deficiency" is a control deficiency, or combination of control deficiencies, that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with accounting principles generally accepted in the United States of America.  In the case of a significant deficiency, a more-than-remote likelihood exists of a misstatement of the company's annual or interim financial statement that is more than inconsequential.

Occam's identified control deficiencies relate to (i) the documentation, assessment, and testing of key controls over financial processes, including revenue recognition; (ii) limitations in financial staffing, with related inadequacies in segregation of duties; (iii) processes for preparation and review of SEC filings, press releases and

1   review of financial schedules; and (iv) the documentation and review of
2   the basis of, support for, and considerations surrounding significant
3   accounting estimates.

4      87.    In truth, defendants had no intention of remedying the deficiencies, as
5   they continued to prematurely recognize revenue during that quarter, and all of 2006.

6      88.    At the same time, the Company began taking steps to conduct its
7   Secondary Offering of the stock to the market.  With its long history of purported
8   strong revenue and customer growth, the Company sought to raise funds from
9   investors and provide its VCFs an opportunity to sell large amounts of Occam stock at
10  inflated prices.  On May 19, 2006, Occam announced that it filed a Registration
11  Statement with the SEC with respect to a proposed offering.  In connection with this
12  proposed offering, Occam stated that it expected to apply to list its common stock on
13  the NASDAQ National Market ("Nasdaq") under the symbol "OCNW".

14     89.    All the while, the Company continued to prematurely recognize revenue
15  and continued to announce stellar quarterly results.  Indeed, defendants were now
16  claiming that the Company was *profitable*.  For example, on July 11, 2006, Occam
17  announced its second quarter 2006 ("2Q06") results, claiming "The company reported
18  quarterly revenue of $16.2 million, posting its third consecutive quarter of operating
19  profit."  In truth, as admitted by the Company's Restatement, *the revenues for the*
20  *quarter were overstated by $3.373 million, or 26%, and the announced profit of*
21  *$0.02 per share was in reality a loss of $0.15 per share*.

22     90.    On October 5, 2006, Occam announced that it received approval from
23  Nasdaq to list its common shares on the NASDAQ.  Its stock began trading  on the
24  Nasdaq on October 9, 2006.

25     91.    Defendants then immediately filed the final Amendment to the
26  Registration Statement and, on November 2, 2006, filed the Prospectus for the
27  Offering which was incorporated into the Registration Statement. Defendants scheme
28  was finally going to pay off.

- 33 -

92.   On November 7, 2006, Occam announced the closing of its public offering of 5,250,000 shares of its common stock at a price of $14.00 per share.  Of the 5,250,000 shares sold in the offering, Occam sold 3,750,000 shares and selling stockholders sold 1,500,000 shares.  The net proceeds to Occam from its sale of the 3,750,000 shares of common stock was approximately $48.3 million after deducting underwriting discounts and commissions and estimated offering expenses.

**Millions in Stock Sales Proceeds**

93.   Defendants' revenue recognition scheme and financial fraud permitted certain Individual Defendants and the VCF defendants to realize profits of over $20 million in stock sales that was extremely suspicious in both timing and amount, as depicted in the following chart:

| Defendant | Date | Shares | Proceeds |
|---|---|---|---|
| Howard-Anderson | 11/14/2006 | 15,000 | $210,000 |
| Krausz | 2/27/2007 | 2,570 | $34,541 |
| NVP Funds | 11/7/2006 | 320,000 | $4,233,600* |
|  | 11/14/2006 | 128,000 | $1,693,440 |
|  |  | **448,000** | **$5,927,040** |
| USVP Funds | 11/7/2006 | 690,000 | $9,128,698* |
|  | 11/14/2006 | 345,000 | $4,564,352 |
|  | 2/21/2007 | 276 | $3,651 |
|  |  | **1,035,276** | **$13,696,701** |
| **Total:** |  | **1,518,416** | **$20,078,282** |

*  Shares sold on 11/7/06 were sold in the November 2006 Offering, pursuant to the false and misleading Registration Statement and Prospectus.

94.   As depicted in the graph below, these insider sales were unusual in timing because ***none of these defendants sold any of their Occam shares in the two years preceding these Class Period or during the first two and a half years of the Class Period***.  Indeed, virtually all of these sales occurred in or directly followed Occam's Offering in November of 2006 – at a time when Occam's stock was at a significant high.  Most importantly, ***all of these sales occurred just as defendants'***



*revenue recognition scheme was coming to an end*.  And, none of defendants' Class Period sales were designed as "planned" sales pursuant to SEC Rule 10b-5.1.

95.   The ***amounts*** of stock sold by the Individual Defendants were also extremely suspicious, comparing the Individual Defendants' Class Period sales to their common stock holdings.  According to their SEC filings ***these defendants sold 100% of all of their personal holdings!***:

| Defendant | Class Period Shares Sold | Class Period Proceeds | Class Period Common Stock Holdings | **Percentage of Common Stock Holdings Sold** |
|---|---|---|---|---|
| Howard-Anderson | 15,000 | $210,000 | 15,000 | **100%** |
| Krausz | 2,570 | $34,541 | 2,570 | **100%** |

96.     Similarly, the VCF defendants also sold significant percentages of their holdings.  According to the Company's 2005 SEC Form 10-K, *as of December 31, 2005, the USVP and NVP Funds possessed 68% of all outstanding voting stock in Occam*.  However, after dumping over a million of their shares in the November 2006 Offering for over $13 million in proceeds, and another 470,000 shares a week later for approximately $6 million in proceeds, according to the Company's 2006 SEC Form 10-K *as of December 31, 2006, the VCFs only possessed 28% of all outstanding voting stock in the Company*.  Thus the stock sales by the VCFs at the end of 2006 represented a substantial percentage of their Occam stock holdings.

## THE TRUTH EMERGES OVER TIME AS DEFENDANTS ENGAGE IN PARTIAL DISCLOSURES AND HALF-TRUTHS

97.     Cognizant that the Company's auditors were looking into the Company's revenue recognition practices in preparation for the drafting and filing of the Company's SEC Form 10-K in early 2007, defendants were forced to halt their fraudulent revenue recognition practices.  As a result, defendants knew that when they announced their fourth quarter 2006 ("4Q06") and FY 2006 results to the market, they had to guide the market lower in their projections for the next quarter – which is exactly what they did.

98.     Thus, after the market closed, defendants issued a press release on February 1, 2007 announcing the Company's 4Q06 and FY 2006 financial results. The press release stated:

> Occam Networks, Inc. (NASDAQ:OCNW), a leading supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications companies, today announced its financial results for the quarter and year ended December 31, 2006.
>
> Revenues totaled $20.1 million for the fourth quarter, which ended December 31, 2006, a tenth straight quarter of increased revenues. Fourth  quarter 2006 revenues represented an increase of 56% over the

fourth quarter of 2005 and 11% sequentially over the third quarter of 2006. Annual revenue for 2006 was $68.6 million, representing a 75% increase over annual revenue for 2005. Net income for the fourth quarter of 2006, calculated in accordance with generally accepted accounting principles ("GAAP"), was $0.9 million or $0.04 per diluted share compared with net income of $0.4 million or $0.03 per diluted share for the fourth quarter of 2005 and net income of $0.2 million or $0.01 per diluted share for the third quarter of 2006. Annual net losses for 2006 and 2005 were $1.9 million and $9.3 million, respectively.

The company also finished the fiscal year by surpassing one million ports shipped. The company believes its fiscal year end results reflect increasing interest among telecommunications service providers in upgrading their networks to offer IPTV, Triple Play and other new, innovative services.

99. Notably, however, and unlike prior earnings press releases, ***this press release said nothing about earnings projections for the future***. Instead, defendants waited for the conference call that evening, in which defendants Farrell and Howard-Anderson participated. On that call, defendants repeated the Company's excellent financial results for the quarter, but then Farrell said:

However, we also recognize that the first calendar quarter of the year is typified by lower network investment than in other quarters. With these factors in mind, we expect Q1 revenues to be sequentially flat, plus or minus a few percentage points. In the first quarter, we anticipate that gross margin will remain roughly flat to slightly down from Q4 levels. As indicated, our margin remains sensitive in mix and Q4 typically has a higher seasonal bias towards blades than in Q1. With that in mind, we expect to see some small variance in margin.

1   100.   This initial disclosure of the financial effects of their fraudulent scheme –

2   that the Company's earnings would be "flat" going forward and that there would be

3   "some small variance in margin" – was a severe disappointment to the market, driving

4   Occam's stock down 20% on February 2, 2007 on huge volume, from $17.60 per

5   share to $14.10 per share in a single day.   Nevertheless, the Company's revenue

6   recognition scheme remained hidden from investors.

7   101.   Then in an April 2, 2007 press release, after the close of trading, Occam

8   surprised investors by disclosing that "***it would not file timely its Annual Report on***

9   ***Form 10-K for the year ended December 31, 2006***."   Occam explained that it was

10   unable to file its SEC Form 10-K because:

11   its Audit Committee is reviewing the Company's commitments to

12   provide customers with software, hardware and software maintenance,

13   hardware and software upgrades, training, and other services in

14   connection with customers' purchases of the Company's network

15   equipment.   The Audit Committee is also considering whether these

16   commitments impact revenue recognition and the adequacy of the

17   Company's internal controls relating to the documentation of customer

18   commitments as part of the terms and conditions of sale.

19   102.   On April 3, 2007, the next trading day, Occam shares again plummeted,

20   from $11.10 per share at the close of trading on April 2, 2007, to $8.51 per share at the

21   close of trading on April 3, 2007, a decline of $2.59 per share or approximately 23%,

22   on heavier than usual volume.

23   103.   On April 3, 2007, one analyst observed that:

24   Occam's audit committee is now looking at certain "sales commitments"

25   made to customers in connection with equipment purchases.   ***At this***

26   ***point, further details on these commitments are not being provided by***

27   ***management.   Our fear, of course, is that the organization's prior***

28   ***results have been getting helped by these on-the-side sales***

- 38 -

1    ***commitments and that the natural run rate of business activity is lower***

2    ***than we previously thought***.   We would not be surprised to see a

3    financials restatement at Occam.

4    104.   Then in an April 17, 2007 press release, after the close of trading, Occam

5    disclosed that that it would "not file its Annual Report on Form 10-K for the fiscal

6    year ended December 31, 2006 by today's 15-day extended filing deadline."

7    105.   On April 18, 2007, Occam shares again declined from $8.91 per share at

8    the close of trading on April 18, 2007, to close at $8.54 per share, a decline $0.37 per

9    share or approximately 4%, on heavier than usual volume.

10    106.   Then on October 16, 2007, the Company finally disclosed the full extent

11    of defendants accounting fraud.  The Company was forced to restate its financial

12    results for the entire last three fiscal years, including each and every SEC Form 10-Q

13    and the 2004 and 2005 SEC Form 10-Ks.  Defendants had caused Occam to

14    improperly recognize $33 million in revenues, more than 27% of all revenues reported

15    for the entire period and management's credibility was destroyed.  In addition, the

16    Company admitted the "internal control deficiencies" and "material weaknesses"

17    continue throughout the Class Period.

18    Internal Control Weaknesses and Remediation

19    As further discussed in Part II, Item 9A of this Form 10-K under

20    the caption "Controls and Procedures," during the course of its

21    investigation, our audit committee identified internal control weaknesses

22    relating primarily to the approval, documentation, communication and

23    accounting for transactions with non-standard terms or for commitments

24    of future functionality or features of the products sold. Our audit

25    committee determined that we lacked sufficient guidelines or processes

26    concerning approval of non-standard terms and that we had no consistent

27    practice to ensure that non-standard terms and shipping methods were

28    consistently documented. Although our audit committee identified some

recent improvements in our internal controls, it found that control deficiencies existed relating to the documentation of the terms of transactions and the internal controls in place to ensure that such terms were accurately and completely communicated for revenue recognition purposes to our finance department. The audit committee also found weaknesses relating to the failure to apply, or misapplication of, technical accounting rules relating to the timing of revenue recognition. Finally, certain of the control weaknesses related to accounting for VAR transactions and the manner in which we assessed and documented our evaluation of the creditworthiness of these resellers.

In addition, our audit committee received a letter dated October 15, 2007 from our current independent registered public accounting firm identifying a material weakness relating to revenue recognition and significant deficiencies relating to segregation of duties, post-closing adjusting journal entries, and accounting for parts and fixed asset purchases. Our chief executive officer and our chief financial officer have further determined that, as of December 31, 2006, our internal controls over financial reporting were not effective to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our consolidated financial statements for external purposes in accordance with generally accepted accounting principles in the United States.

107.   On this last disclosure, the market hammered the stock, driving it down another 32% from $9.23 to $6.29 per share on extremely heavy volume.

108.   Analysts were again shocked and disappointed by the magnitude and scope of the restatement, and openly questioned management's credibility.   For example, on the October 17, 2007 conference call with analysts, the following transpired:

1      ***Herb Chen*** - Analyst: On the one hand you seem to have an

2      excellent product, that's gained a lot of traction with customers ***but on***

3      ***the other hand, management and governance here has been nothing***

4      ***short of atrocious. You look back at the restated financials and you***

5      ***see that you clearly had no clue how to recognize revenue, and there***

6      ***was, even worse, a concerted effort to manipulate results at times, so***

7      ***both those are pretty unacceptable, worse yet, you've been warned by***

8      ***your auditors of significant internal control deficiencies and they seem***

9      ***to exist to this date to my astonishment.***

10      What do you have to say?  Why not just sell the Company to

11      someone who can take your assets and do something with it?

12      ***Bob Howard-Anderson*** - Occam Networks - CEO: Thanks Herb.

13      What we have to say is that we have concluded a difficult restatement.  It

14      was very thorough, done by independent auditors and forensics. We're

15      happy to have gotten it behind us. We believe we still have a very

16      exciting opportunity in front of us. We do not want to sell the Company

17      while we have, we play in a very large and growing market. We have

18      competitively advantaged products that are gaining the acceptance of

19      customers in a very healthy rate, and we want to take advantage of that

20      future opportunity.

21      ***Herb Chen*** - Analyst: ***Well, two of your Board members are***

22      ***venture capitalists who own probably close to 30% of the Company.***

23      ***They made a pretty big distribution of shares right before this***

24      ***accounting scandal broke. I don't know if that was coincidental or not.***

25      It seems like they would like to sell shares. I mean, you've been unable

26      to get a real public market going at an acceptable valuation. Why

27      shouldn't the Board sell you guys? I mean, they obviously are voting

28      with their feet as well.

1          *     *     *

2          **Brian Garnett** - Analyst: I think it's great that you have all of

3    these wonderful opportunities ahead of you, ***but I have a question and***

4    ***that is do you think you've executed well to date***?

5    **Bob Howard-Anderson** - Occam Networks - CEO: This is a Company

6    that has done an amazing job of introducing a very innovative product

7    that's gained over 250 customers now accepting that and deploying it

8    quite widely. We grew revenues at an industry-leading pace percentage

9    wise year-over-year for several years. That revenue has now been

10   deemed all legit and was merely an issue of timing. On that front we did

11   a great job executing. ***Clearly, as I said, nobody likes to restate and***

12   ***clearly we had some controls and deficiencies and we're now working***

13   ***hard with the same kind of focus and determination to put that behind***

14   ***us as well***.

15         **Brian Garnett** - Analyst: Well, as the guy in charge who basically

16   was supposed to be overlooking all of this, ***and then I kind of sort of***

17   ***question your judgment to go out on the road to a couple of***

18   ***conferences to pitch your story, and you obviously knew what was***

19   ***happening at the Company during this time, I mean, what were you***

20   ***thinking?*** What were you trying to tell potential new investors about

21   your story?

22         **Bob Howard-Anderson** - Occam Networks - CEO: Well, I think

23   Occam has, like I said shown a great track record of products and

24   customer acquisition and I believe we have a great opportunity in front

25   of us and that's what I'm trying to convey.

26         109.   Similarly, on October 17, 2007, an article in The Motley Fool openly

27   criticized the restatement and lampooned management's response.  In an article titled

28   "*Tuesday's Worst Stocks in the World*," analyst Tim Beyers wrote:

1   But the biggest problem wasn't with the bottom line.  It was at the

2   top, with revenue.  Quoting the press release:

3   The Audit Committee identified errors pertaining to the **timing of**

4   **revenue recognition** rather than the ability to collect or ultimately realize

5   revenue.  The Audit Committee did not identify any instances where the

6   Company recorded revenue that was not ultimately collected or

7   realizable.

8   **Translation: "We may have stuffed the channel, but at least it**

9   **swallowed**."

10   **Anyone wondering whether a severe bout of indigestion is next?**

11   110.   The entire debacle has decimated Occam's stock price, and it has not

12   recovered.  It continues to decline and **currently trades in the $3 range – a range in**

13   **which the stock traded before the Class Period**.

14   **FALSE AND MISLEADING STATEMENTS**

15   111.   The Class Period begins on April 29, 2004, with the announcement of

16   Occam's 1Q04 earnings.  On that date, defendants issued a press release reporting the

17   Company's financial results for the quarter 1Q04, and issued the following statement:

18   Occam Networks Inc. (OTCBB:OCCM), a leading supplier of

19   innovative Ethernet and IP-based loop carrier equipment to

20   telecommunications service providers, today reported results for the first

21   quarter of 2004.  **Occam Networks reported revenue for the quarter of**

22   **$3.2 million, an increase of $1.7 million over the $1.5 million reported**

23   **for Q1 2003**.  The company also added seven new customers during the

24   quarter.

25   *        *        *

26   "We are very pleased to have added seven new customers in the

27   first quarter of 2004, reflecting continued acceptance of our BLC 6000

28   product line," said Bob Howard-Anderson, president and CEO of Occam

- 43 -

Networks.  "*However, in the short term, we may continue to see uneven quarter-to-quarter results as the timing of the start and completion of projects at each new customer, or new initiatives at existing customers, can be a significant component of our revenue in any quarter*."

112.   Yet in spite of reporting an increase of more than 100% in revenues, the market reacted *unfavorably* to the announcement.  Defendants realized that defendant Howard-Anderson's statement that "'in the short term, we may continue to see uneven quarter-to-quarter results'" due to the Company's revenue stream was viewed very negatively by the market.  It was a mistake they would never make again in announcing the Company's results.

113.   On May 17, 2004, defendants caused the Company to file its SEC Form 10-Q for 1Q04, which repeated the financial results previously issued in the press release.  It was signed by CFO Bailey.

114.   The May 17, 2004 SEC Form 10-Q also made the following statement concerning revenue recognition practices at the Company.

Our sales are generated from sales arrangements, which require a certain amount of revenue recognition judgments, particularly in the area of customer acceptance.  *The terms and conditions of acceptance of the product for each sales agreement will dictate when sales revenue will be recognized.  We recognize revenue when persuasive evidence of a sales arrangement exists, delivery has occurred or services have been rendered, the buyer's price is fixed or determinable and collectibility is reasonably assured*.  We allow credit or replacement for products returned within our policy terms.  Such returns are estimated and an allowance is provided, if required, at the time of sale.  To date, no such allowance has been required.  We provide post-sales technical training on a fee basis.  We provide hardware warranty for our products for 5 years and make provisions for that expense at the time of sale.  We

provide customer support and software maintenance for one year at no cost. After that time it is done on a fee basis. We record an estimate of warranty costs when revenue is recognized based on actual history and projected returns and failure rates and repair costs.

115. Additionally, in connection with the May 17, 2004 SEC Form 10-Q, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified that:

1. I have reviewed this quarterly report on Form 10-Q of Occam Networks, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

- 45 -

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

116.   On August 4, 2004, defendants issued a press release reporting the Company's financial results for 2Q04, and issued the following statement:

Occam Networks Inc. (OTCBB:OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications

service providers worldwide, today reported results for the second quarter of 2004, which ended June 27, 2004. *The company reported revenue for the quarter of $3.185 million, showing substantial growth over the same period last year*.

\*       \*       \*

"Over the last several quarters we have added between five and ten new customers per quarter, and last quarter we started over a dozen new trials," said Bob Howard-Anderson, president and CEO of Occam Networks. "*With this continued trend of new customer adoption and now the RUS listing, we believe we are well positioned to drive additional revenue growth in the coming quarters*."

117.   On August 16, 2004, defendants caused the Company to file its SEC Form 10-Q for Q2 04, which repeated the financial results previously issued in the press release. It was signed by CFO Bailey. The 10-Q also repeated the Company's revenue recognition practices set forth above in ¶114.

118.   Additionally, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

119.   On October 27, 2004, defendants issued a press release reporting the Company's financial results for 3Q04, and issued the following statement:

Occam Networks Inc. (OTCBB:OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today reported results for the third quarter of 2004, which ended in September. *The company reported revenue for the quarter of $4.5 million, an increase of $3.0 million over the $1.5 million reported for Q3 2003. Revenues for Q3 2004 set a new company record and represented a 205 percent increase over the same*

- 47 -

*period last year, as well as a $1.3 million or 41 percent improvement over Q2 of 2004*.  Q3 2004 gross margins improved to 16 percent of sales as a result of substantially lower field return expense and growing manufacturing volumes.

"*During the last quarter, Occam focused its efforts on growing sales, and improving gross margins and controlling expenses," said Bob Howard-Anderson, president and CEO of Occam Networks.  "As a result, we set a new revenue record for the company in a challenging environment.  I am pleased with the company's overall execution and our strong financial showing*."

120.   On November 15, 2004, defendants caused the Company to file its SEC Form 10-Q for 3Q04, which repeated the financial results previously issued in the press release.  It was signed by CFO Bailey.  The SEC Form 10-Q also repeated the Company's revenue recognition practices set forth above in ¶114.

121.   Additionally, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

122.   On February 16, 2005, defendants issued a press release reporting the Company's financial results for 4Q04.  The press release was titled *Occam Networks Announces Record Revenue for Q4 2004; Company More than Doubles Annual Revenue over 2003*, and stated:

Occam Networks Inc. (OTCBB:OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today reported results for the fourth quarter of 2004, which ended Dec. 31, 2004.  *The company reported revenue for the quarter of $6.5 million, setting a new record.  Fourth quarter 2004 revenues represented an increase of 46 percent over the third*

- 48 -

*quarter of 2004, the company's previous highest revenue quarter. During the quarter gross margins continued to improve, with the quarterly operating loss reduced from $3.0 million ($3.2 million on a GAAP basis) in the third quarter to $2.0 million ($2.2 million on a GAAP basis) this quarter*.   Non-GAAP net loss excludes non-cash expenses associated with amortization of deferred compensation. *Annual revenue for 2004 was $17.3 million, more than doubling annual revenue of $7.9 million for 2003*.

\*     \*     \*

"*Occam experienced substantial revenue growth in 2004, with Q4 being our best revenue quarter ever,*" said Bob Howard-Anderson, president and CEO of Occam Networks.  "*In 2004, we significantly increased revenue, added 31 new customers for a total of 75 and increased our gross margins.  We are very pleased with the company's progress*."

123.   On March 31, 2005, defendants caused the Company to file its SEC Form 10-K for FY 2004, which repeated the financial results previously issued in the press release and included the Company's audited financial results for FY 2004.  It was signed by defendants Howard-Anderson, Bailey, Krausz, Abbott and others.  It was certified by PwC.

124.   The FY 2004 Form 10-K also made the following statements:

**Evaluation of Disclosure Controls and Procedures**.

Our management evaluated, with participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K.  Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that

- 49 -

1    information we are required to disclose in reports that we file or submit

2    under the Securities and Exchange Act of 1934 is recorded, processed,

3    summarized and reported within the time periods specified in Securities

4    and Exchange Commission rules and forms.

5                    *        *        *

6    **Revenue Recognition**

7            Occam's sales are generated from sales arrangements, which

8    require revenue recognition judgments, particularly in the area of

9    customer acceptance.  The terms and conditions of acceptance of the

10   product for each sales agreement will dictate when sales revenue will be

11   recognized.  Occam recognizes revenue when persuasive evidence of a

12   sales arrangement exists, delivery has occurred or services have been

13   rendered, the buyer's price is fixed or determinable and collectibility is

14   reasonably assured.    In certain circumstances, Occam enters into

15   arrangements with customers who receive financing support in the form

16   of long-term low interest rate loans from the United States Department

17   of Agriculture's Rural Utilities Service (RUS).  The terms of the RUS

18   contracts provide that in certain instances transfer of title of Occam's

19   products does not occur until payment has been received.  In these cases,

20   Occam does not recognize revenue until payment has been received,

21   assuming the remaining revenue recognition criteria are met.  Occam

22   provides post-sales technical support on a fee basis.  Occam provides

23   hardware warranty for its products for five years and makes provisions

24   for that expense at the time of sale.  Occam provides customer support

25   and software maintenance for one year at no cost.  Occam records an

26   estimate of warranty costs when revenue is recognized based on

27   projected returns, actual historical failure rates and repair costs.

28

125.   Additionally, in connection with the 2004 SEC Form 10-K both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

126.   The FY 2004 statements above in ¶¶111-125 were false and misleading because they created a false impression that the Company's reported revenues and revenue growth was coming solely from legitimate business enterprise when in fact it was in substantial part the direct result of defendants' intentional scheme to improperly recognizing revenues each quarter in order to meet market expectations and increase the price of the Company's stock.  More specifically, these statements misled the investing public because at the time they were made defendants knew, or were reckless in not knowing, that:

(a)   As more fully described below and admitted in the Company's Restatement, the Company's seemingly positive financial results in each quarter and for the entire FY 04 were in substantial part based upon revenues that the Company was not entitled to recognize during the period in which they were recognized, in violation of GAAP;

(b)   As more fully described above and admitted in the Restatement, the Company suffered from numerous internal control deficiencies concerning the Company's accounting and revenue recognition, its public reporting of financial results, and its disclosures to the SEC; and

(c)   As more fully described above, the Company's improper reporting of revenues in each quarter and improperly inflated revenues was the direct result of a scheme engaged in by the Company executives, Audit Committee members and the Company's largest shareholders.

127.   On May 18, 2005, defendants issued a press release reporting the Company's financial results for 1Q05.  The press release was titled *Occam Networks*

- 51 -

*Reports Record Revenues in Q1 2005; Company Achieves Record Revenue and Double-Digit New Customer Growth for Third Consecutive Quarter*, and stated:

Occam Networks Inc. (OTCBB: OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today announced results for the first quarter of 2005, which ended March 31, 2005. ***The company reported revenue for the quarter of $6.9 million, setting a new company record for the third consecutive quarter***. The company also added 13 new customers during the quarter, continuing to add new customers at double-digit rates for the third consecutive quarter.

"Occam's focus on delivering exceptional Ethernet- and IP-based products to telcos has resulted in another solid quarter of growth for the company," said Bob Howard-Anderson, president and CEO of Occam Networks. "***This is the third consecutive quarter in which we have experienced record revenues and high customer acquisition rates. The telcos' increasing preference for Ethernet and IP technologies in the access network is driving our robust growth. We expect our leadership, expertise and experience with these technologies to continue to drive our success***."

128.   On May 16, 2005, defendants caused the Company to file its SEC Form 10-Q for 1Q05, which repeated the financial results previously issued in the press release. It was signed by CFO Bailey.

129.   The May 16, 2005, SEC Form 10-Q also made the following statement concerning revenue recognition practices at the Company:

Revenue Recognition

***Occam recognizes revenue when persuasive evidence of sales arrangements exists, delivery has occurred or services have been rendered, the buyer's price is fixed or determinable and collectibility is***

- 52 -

*reasonably assured. Occam allows credit for products returned within its policy terms*.  Occam provides training and post-sales technical support and maintenance to its customers as needed to assist them in installation or use of its products, and makes provisions for these costs in the periods of sale.  Occam further warrants its products for periods up to 5 years and records an estimated warranty cost when revenue is recognized.

In certain circumstances, Occam enters into arrangements with customers who receive financing support in the form of long-term low interest rate loans from the United States Department of Agriculture's Rural Utilities Service (RUS).  The terms of the RUS contracts provide that in certain instances transfer of title of Occam's products does not occur until payment has been received.  In these cases, Occam does not recognize revenue until payment has been received, assuming the remaining revenue recognition criteria are met.

130.   Additionally, in connection with the May 16, 2005, SEC Form 10-Q, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

131.   On June 28, 2005, defendants caused the Company to file an SEC Form 8-K, advising that it had "dismissed" PricewaterhouseCoopers as its auditor, and that PwC had discovered internal control deficiencies likely amounting to a "material weakness."

132.   On August 9, 2005, defendants issued a press release reporting the Company's financial results for 2Q05.  The press release was titled *Occam Networks Posts Fourth Consecutive Quarter of Record Revenues and Double-Digit New Customer Growth*, and stated:

Occam(R) Networks Inc. (OTCBB: OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today announced results for the second quarter of 2005, which ended June 30, 2005. ***The company reported revenue for the quarter of $8.7 million, setting a new company record for the fourth consecutive quarter. Second-quarter 2005 revenues represented an increase of 26 percent over the $6.9 million reported for the first quarter of 2005, and a 174 percent increase over the $3.2 million reported for second quarter of 2004***. The company also added more than a dozen new customers for the fourth consecutive quarter, bringing the company's total number of customers to 100.

"***The second quarter was another solid quarter for Occam – we added our 100th customer, grew revenues, announced several significant new products, and increased the awareness and visibility of Occam in our target markets,***" said Bob Howard-Anderson, president and CEO of Occam Networks. "Our continued success demonstrates the growing acceptance by Telcos that Ethernet and IP are superior technologies for building simple, cost-effective access networks for delivering new services, especially Triple Play."

133.   On August 15, 2005, defendants caused the Company to file its SEC Form 10-Q for 2Q05, which repeated the financial results previously issued in the press release. It was signed by CFO Bailey. The 10-Q also repeated the Company's revenue recognition practices set forth above in ¶129.

134.   Additionally, in connection with the 10-Q, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

- 54 -

135.   On November 8, 2005, defendants issued a press release reporting the Company's financial results for 3Q05.  The press release was titled *Occam Networks Announces Record Revenues for Q3 2005; Company Posts Fifth Consecutive Quarter of Record Revenues; Continues to Add Customers at the Rate of Over a Dozen Per Quarter*, and stated:

Occam(R) Networks Inc. (OTCBB: OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today announced results for the third quarter of 2005, which ended Sept. 30, 2005.  ***The company reported revenue for the quarter of $10.7 million, an increase of more than 20 percent over the $8.7 million reported for the second quarter of 2005, and a more than 140 percent increase over the $4.4 million reported for the third quarter of 2004***.  Occam also continued its trend of adding more than a dozen new customers in the quarter.

***"We are pleased to have achieved a new revenue record for the quarter, and to have continued our trend of significant quarter-over-quarter revenue and customer growth,"*** *said Bob Howard-Anderson, president and CEO of Occam Networks.*  ***"We believe our business for Q4 is on track to deliver additional revenue increases and continued growth in our customer base***."

***Occam's third quarter gross margins showed improvement over second quarter margins as a result of higher revenue and lower contract manufacturing costs.  The company believes that increased revenue and lower manufacturing costs should result in further margin improvement in the fourth quarter and reconfirms its long-term gross margin target of approximately 40 percent***.

***"We continue to focus on growing revenue and improving gross margins while controlling operating expenses,"*** *said Howard-*

*Anderson*.   The company reconfirmed its forecast that it will report operating income on a pro-forma, non-GAAP basis close to break even in the fourth quarter (excluding non-cash charges for the amortization of stock option expense).   Occam expects that it may continue to report operating losses on a GAAP basis in the fourth quarter (including non-cash charges for the amortization of stock option expense).

136.   On November 14, 2005, defendants caused the Company to file its SEC Form 10-Q for 3Q05, which repeated the financial results previously issued in the press release.  It was signed by CFO Bailey.  The SEC Form 10-Q also repeated the Company's revenue recognition practices set forth above in ¶129.

137.   Additionally, in connection with the November 14, 2005 SEC Form 10-Q, both Bailey and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

138.   On February 9, 2006, defendants issued a press release reporting the Company's financial results for 4Q05 and FY 2005.  The press release was titled *Occam Networks Posts First Profitable Quarter; Company Reports Third Year of Record Growth, More than Doubling Revenue from Previous Year*, and stated:

Occam Networks Inc. (OTCBB:OCCM), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers worldwide, today reported results for the fourth quarter of 2005, which ended Dec. 31, 2005, posting its first-ever profitable quarter.  ***The company reported revenue for the quarter of $12.9 million, setting its sixth consecutive new revenue record.  Fourth quarter 2005 revenues represented an increase of ninety-nine percent over the fourth quarter of 2004 and 21 percent sequentially over the third quarter of 2005.  Annual revenue for 2005 was $39.2 million,***

- 56 -

*more than doubling annual revenue for 2004.  During the quarter gross margins also improved substantially as a result of supply chain improvements and product cost reductions*.  Margins also included a one-time benefit of $482,000 attributed to the reversal of an accrual for outstanding purchase commitments.  Excluding this benefit, the company's operating income remained positive and net income was near breakeven.

"*We entered 2005 with the objectives of increasing revenues and margins, growing our customer base and attaining quarterly profitability," said Bob Howard-Anderson, president and CEO of Occam Networks.  "I am very pleased that the team met each of those objectives, delivering record sales growth in 2005 by continuing to build a loyal customer base*."

139.   On March 30, 2006, defendants caused the Company to file its SEC Form 10-K for FY 2005, which repeated the financial results previously issued in the press release and included the Company's audited financial results for FY 2005.  It was signed by Howard-Anderson, Farrell, Krausz, Abbott and others.  It was certified by Singer Lewak.

140.   The FY 2005 Form 10-K also made the following statements:

Revenue Recognition

Occam's sales are generated from sales arrangements, which require revenue recognition judgments, particularly in the area of customer acceptance.  *The terms and conditions of acceptance of the product for each sales agreement will dictate when sales revenue will be recognized.  Occam recognizes revenue when persuasive evidence of a sales arrangement exists, delivery has occurred or services have been rendered, the buyers price is fixed or determinable and collectibility is reasonably assured*.  In certain circumstances, Occam enters into

- 57 -

arrangements with customers who receive financing support in the form of long-term low interest rate loans from the United States Department of Agriculture's Rural Utilities Service (RUS). The terms of the RUS contracts provide that in certain instances transfer of title of Occam's products does not occur until payment has been received. In these cases, Occam does not recognize revenue until payment has been received, assuming the remaining revenue recognition criteria are met. Occam provides post-sales technical support on a fee basis. Occam provides hardware warranty for its products for five years and makes provisions for that expense at the time of sale. Occam provides customer support and software maintenance for one year at no cost. Occam records an estimate of warranty costs when revenue is recognized based on projected returns, actual historical failure rates and repair costs.

141. Additionally, in connection with the FY 2005 SEC Form 10-K both CEO Howard-Anderson and Farrell executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

142. The FY 2005 statements above in ¶¶127-141 were false and misleading because they created a false impression that the Company's reported revenues and revenue growth was coming from legitimate business enterprise, when in fact it was the direct result of defendants' improperly recognizing revenues in order to meet analyst expectations and increase the price of the Company's stock. More specifically, these statements misled the investing public because at the time they were made defendants knew, or were reckless in not knowing, that:

(a)    As more fully described below and admitted in the Company's Restatement, the Company's seemingly positive financial results in each quarter and for the entire FY 05 were in substantial part based upon revenues that the Company

1   was not entitled to recognize during the period in which they were recognized, in

2   violation of GAAP;

3                (b)      As more fully described above and admitted in the Restatement,

4   the Company suffered from numerous internal control deficiencies concerning the

5   Company's accounting and revenue recognition, its public reporting of financial

6   results, and  disclosures to the SEC; and

7                (c)      As more fully described above, the Company's improper reporting

8   of revenues in each quarter and improperly inflated revenues was the direct result of a

9   scheme engaged in by the Company executives, Audit Committee members and the

10  Company's largest shareholders.

11         143.   On May 2, 2006, Occam announced its results for the first quarter ended

12  March 26, 2006:

13              Occam Networks Inc. (OTCBB: OCNW), a supplier of innovative

14         Ethernet and IP-based loop carrier equipment to telecommunications

15         service providers worldwide, today reported results for the first quarter

16         of 2006, which ended March 31, 2006.  ***The company reported quarterly***

17         ***revenue of $14.2 million, posting its second consecutive quarter with***

18         ***operating profit.  First quarter 2006 revenues represented an increase***

19         ***of 10 percent over the fourth quarter of 2005, and a 105 percent***

20         ***increase over the same quarter a year ago***.  During the quarter Occam

21         added more than 10 new customers.

22              "Occam's second quarter of operating profitability clearly

23         demonstrates our ongoing commitment to solid financial performance,"

24         said Bob Howard-Anderson, president and CEO of Occam Networks.

25         "Our ability to deliver an excellent product at an attractive price backed

26         by outstanding customer service has enabled us to continue to win

27         against our competitors. ***As we move forward in 2006, we will maintain***

28         ***our focus on increasing revenue and profitability by delivering***

1   *superior products, adding new customers and actively-managing*

2   *operational and other costs. We are off to a strong start for the year*."

3   144.   On May 10, 2006, defendants caused the Company to file its SEC Form

4   10-Q for 1Q06, which repeated the financial results previously issued in the press

5   release. It was signed by CFO Farrell.

6   145.   The May 10, 2006 SEC Form 10-Q also made the following statement

7   concerning revenue recognition practices at the Company:

8   Revenue Recognition

9   *Occam recognizes revenue when persuasive evidence of sales*

10   *arrangements exist, delivery has occurred or services have been*

11   *rendered, the buyer's price is fixed or determinable and collection is*

12   *reasonably assured. Occam allows credit for products returned within*

13   *its policy terms*.

14   In addition to the aforementioned general policy, the company

15   enters into transactions that represent multiple-element arrangements,

16   which may include training and post-sales technical support and

17   maintenance to its customers as needed to assist them in installation or

18   use of its products, and makes provisions for these costs in the periods of

19   sale. Multiple-element arrangements are assessed to determine whether

20   they can be separated into more than one unit of accounting. A multiple-

21   element arrangement is separated into more than one unit of accounting

22   if all of the following criteria are met.

23   •   The delivered item(s) has value to the client on a stand-

24   alone basis.

25   •   There is objective and reliable evidence of the fair value of

26   the undelivered item(s).

27   •   If the arrangement includes a general right of return relative

28   to the delivered item(s), delivery or performance of the

undelivered item(s) is considered probable and substantially in the control of the company.

*If these criteria are not met, then revenue is deferred until such criteria are met or until the period(s) over which the last undelivered element is delivered.  If there is objective and reliable evidence of fair value for all units of accounting in an arrangement, the arrangement consideration is allocated to the separate units of accounting based on each unit's relative fair value*.

In certain circumstances, Occam enters into arrangements with customers who receive financing support in the form of long-term low interest rate loans from the United States Department of Agriculture's Rural Utilities Service (RUS).  The terms of the RUS contracts provide that in certain instances transfer of title of Occam's products does not occur until customer acceptance.   In these cases, Occam does not recognize revenue until payment has been received, assuming the remaining revenue recognition criteria are met.

Occam further warrants its products for periods up to five years and records an estimated warranty cost when revenue is recognized.

146.   Additionally, in connection with the May 10, 2006 SEC Form 10-Q, both Farrell and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

147.   On July 11, 2006, Occam announced its results for the second quarter ended June 25, 2006:

Occam Networks Inc. (OTCBB: OCNW), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers, today reported results for the second quarter of 2006,

which ended June 25, 2006.  ***The company reported quarterly revenue of $16.2 million, posting its third consecutive quarter of operating profits and its eighth consecutive new revenue record. Second quarter 2006 revenues represented an increase of 14 percent over the first quarter of 2006, and an 86 percent increase over the same second quarter of 2005.***

*"**We had an outstanding quarter – we significantly expanded our customer base to more than 170 customers and again we increased quarterly operating profits," said Bob Howard-Anderson, president and CEO of Occam Networks**.  "We continue to strengthen and grow the company in a focused and strategic manner as we aim to remain profitable while we expand our business."*

148.   On August 9, 2006, defendants caused the Company to file its SEC Form 10-Q for 2Q06, which repeated the financial results previously issued in the press release.   It was signed by CFO Farrell. The SEC Form 10-Q also repeated the Company's revenue recognition practices set forth above in ¶143.

149.   Additionally, in connection with the August 9, 2006 SEC Form 10-Q, both Farrell and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that above in ¶115.

150.   On October 10, 2006, Occam announced its results for the third quarter ended September 24, 2006:

Occam Networks Inc. (NASDAQ: OCNW), a supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications service providers, today reported results for the third quarter of 2006, which ended September 24, 2006.  ***The company reported quarterly revenue of $18.1 million, posting its fourth***

- 62 -

*consecutive quarter of operating profits and its ninth consecutive new*
*revenue record.  Third quarter 2006 revenues represented a 69 percent*
*increase over the same third quarter of 2005 and an increase of 12*
*percent over the second quarter of 2006.*

> *"It was another substantial growth quarter for Occam on many*
> *fronts," said Bob Howard-Anderson, President and CEO of Occam*
> *Networks.*

151.   On October 13, 2006, defendants caused the Company to file its SEC Form 10-Q for 3Q06, which repeated the financial results previously issued in the press release.  It was signed by CFO Farrell.  The SEC Form 10-Q also repeated the Company's revenue recognition practices set forth above in ¶143.

152.   Additionally, in connection with the October 13, 2006 SEC Form 10-Q, both Farrell and CEO Howard-Anderson executed and filed with the SEC the Certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they certified the financial results and the Company's internal controls, using language identical to that found in ¶115.

153.   The FY 2006 statements above in ¶¶143-152 were false and misleading because they created a false impression that the Company's reported revenues and revenue growth was coming from legitimate business enterprise, when in fact it was the direct result of defendants' improperly recognizing revenues in order to meet analyst expectations and increase the price of the Company's stock.   More specifically, these statements misled the investing public because at the time they were made defendants knew, or were reckless in not knowing, that:

(a)     As more fully described below and admitted in the Company's Restatement, the Company's seemingly positive financial results in each quarter and for the entire FY 06 were in substantial part based upon revenues that the Company was not entitled to recognize during the period in which they were recognized in violation of GAAP;

(b)     As more fully described above and admitted in the Restatement, the Company suffered from numerous internal control deficiencies concerning the Company's accounting and revenue recognition, its public reporting of financial results, and its disclosures to the SEC; and

(c)     As more fully described above, the Company's improper reporting of revenues in each quarter and improperly inflated revenues was the direct result of a scheme engaged in by the Company executives, Audit Committee members and the Company's largest shareholders.

**The False and Misleading Registration Statement and Prospectus**

154.   On October 13, 2006, the Company filed an Amendment No. 3 to the Registration Statement with the SEC on Form S-l/A that contained the Company's financial statements for the periods ended March 26, 2006, June 25, 2006 and September 24, 2006.

155.   On November 2, 2006, the Company filed a Prospectus with the SEC pursuant to Rule 424(b)(1) as part of the Registration Statement that again contained the Company's financial statement for the periods ended March 26, 2006, June 25, 2006 and September 24, 2006.

156.   The Registration Statement and Prospectus also incorporated the Company's previously filed financial results, including those for FY 2004 and FY 2005.  These included the auditor's reports and certifications for those years, which were included with the knowledge and permission of PwC and Singer Lewak respectively.  The Registration Statement and Prospectus also included the following additional false and misleading statements:

Revenue Recognition

We recognize sales revenue when persuasive evidence of sales arrangements exist, delivery has occurred or services have been rendered, the buyer's price is fixed or determinable and collection is

reasonably assured. We allow credit for products returned within our policy terms.

In addition to the aforementioned general policy, we enter into transactions that represent multiple-element arrangements, which may include training and post-sales technical support and maintenance to our customers as needed to assist them in installation or use of our products, and make provisions for these costs in the periods of sale. Multiple-element arrangements are assessed to determine whether they can be separated into more than one unit of accounting. A multiple-element arrangement is separated into more than one unit of accounting if all of the following criteria are met.

- The delivered item(s) has value to the customer on a stand-alone basis.

- There is objective and reliable evidence of the fair value of the undelivered item(s).

- If the arrangement includes a general right of return relative to the delivered item(s), delivery or performance of the undelivered item(s) is considered probably and substantially in our control.

If these criteria are not met, then sales are deferred until such criteria are met or until the period(s) over which the last undelivered element is delivered. If there is objective and reliable evidence of fair value for all units of accounting in an arrangement, the arrangement consideration is allocated to the separate units of accounting based on each unit's relative fair value.

In certain circumstances, we enter into arrangements with customers who receive financing support in the form of long-term low interest rate loans from the United States Department of Agriculture's Rural Utilities Service, or RUS. The terms of the RUS contracts provide

that in certain instances transfer of title of our products does not occur until customer acceptance.  In these cases, we do not recognize revenue until payment has been received, assuming the remaining revenue recognition criteria are met.

We further warrant our products for periods up to five years and record an estimated warranty accrual when sales revenue is recognized.

\*     \*     \*

Internal Controls

In a March 2005 management letter, our independent registered public accounting firm at that time identified certain internal control deficiencies in connection with their audit of our consolidated financial statements for the year ended December 26, 2004.  Of those deficiencies, our prior independent registered public accounting firm indicated, without drawing any affirmative conclusion, that three could potentially constitute material weaknesses.   Specifically, our prior independent registered public accounting firm indicated that a deficiency relating to segregation of duties was a "likely" material weakness, a deficiency relating to preparation of Exchange Act filings "could result" in a material weakness, and a deficiency relating to the quality of supporting schedules "could lead to a more than a remote likelihood of material misstatement."

\*     \*     \*

During 2005 and 2006, we implemented numerous remedial measures to address the deficiencies reported in the management letter from our independent registered public accounting firm.  A list of objectives and remedial measures implemented to date with respect to the matters identified by our prior independent registered public accounting firm is as follows:

- 66 -

- *Segregation of Duties.* With respect to ensuring appropriate segregation of duties, we have (i) substantially increased the size of our finance department; (ii) implemented a formal approval process and allocation of accounting and review duties, and (ii) established a structured review process for accounting a and public reporting.

- *Exchange Act Filing.* We have (i) implemented schedules for the preparation and review of our Exchange Act filings and press releases, (ii) increased the time available for all parties to review and comment on draft documents, and (iii) increased audit committee participation in the review and revision of such documents.

- *Supporting schedules and underlying accounts.* We have (i) standardized and documented the processes for preparation of supporting schedules and making significant estimates, (ii) standardized and documented the formats of supporting schedules and preparation of estimates, including warranty, sales return and accounts receivable reserves, and (iii) developed a review process consistent with the framework for appropriate segregation of duties.

*Where remedial measures have taken time to implement, such as the addition of finance staff and the segregation of duties, we have implemented additional levels of review to help ensure that any erroneous entries or misstatements are caught before they are reflected in our consolidated financial statements. Management believes that while more permanent changes are being adopted, these manual controls have been effective in reporting accurate financial results in accordance with accounting principles generally accepted in the United States of America.*

157. The statements above in ¶¶154-156 were false and misleading because they created a false impression that the Company's reported revenues and revenue

growth was coming from legitimate business enterprise, when in fact it was the direct result of defendants' improperly recognizing revenues in order to meet analyst expectations and increase the price of the Company's stock.  More specifically, these statements misled the investing public because at the time they were made defendants knew, or were reckless in not knowing, that:

(a)     As more fully described below and admitted in the Company's Restatement, the Company's seemingly positive financial results in each quarter of 2006 and for the entire FY 04 and FY 05 were in substantial part based upon revenues that the Company was not entitled to recognize during the period in which they were recognized in violation of GAAP;

(b)     As more fully described above and admitted in the Restatement, the Company suffered from numerous internal control deficiencies concerning the Company's accounting and revenue recognition, its public reporting of financial results, and its disclosures to the SEC; and

(c)     As more fully described above, the Company's improper reporting of revenues in each quarter and improperly inflated revenues was the direct result of a scheme engaged in by the Company executives, Audit Committee members and the Company's largest shareholders.

158.   On February l, 2007, Occam announced its financial results for Q4 2006 and the year ended December 31, 2006:

Occam Networks, Inc. (NASDAQ: OCNW), a leading supplier of innovative Ethernet and IP-based loop carrier equipment to telecommunications companies, today announced its financial results for the quarter and year ended December 31, 2006.

***Revenues totaled $20.1 million for the fourth quarter, which ended December 31, 2006, a tenth straight quarter of increased revenues. Fourth quarter 2006 revenues represented an increase of 56% over the fourth quarter of 2005 and 11% sequentially over the***

*third quarter of 2006.  Annual revenue for 2006 was $68.6 million, representing a 75% increase over annual revenue for 2005. Net income for the fourth quarter of 2006, calculated in accordance with generally accepted accounting principles ("GAAP"), was $0.9 million or $0.04 per diluted share compared with net income of $0.4 million or $0.03 per diluted share for the fourth quarter of 2005 and net income of $0.2 million or $0.01 per diluted share for the third quarter of 2006*.

159.   The statements made above in ¶158 were materially false and misleading when made because defendants knowingly or deliberately recklessly disregarded that:

(a)     As more fully described below and admitted in the Company's Restatement, the Company's seemingly positive financial results in 4Q 2006 and for the entire FY 06 were in substantial part based upon revenues that the Company was not entitled to recognize during the period in which they were recognized, in violation of GAAP; and

(b)     As more fully described above, the Company's improper reporting of revenues in each quarter and improperly inflated revenues was the direct result of a scheme engaged in by the Company executives, Audit Committee members and the Company's largest shareholders.

## OCCAM NETWORK'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

160.   To overstate Occam's revenues and understate its net losses and losses per share during FY 2004, FY 2005 and FY 2006, defendants caused Occam to employ several improper accounting schemes, in violation of GAAP and SEC guidance, including the improper and premature recognition of revenue where:

(a)     All or portions of the product or services bundled in sales transactions had not been delivered or performed in the quarter revenue was recognized;

(b)     the product was not even available yet;

- 69 -

1           (c)     reseller customers did not have the ability to pay for the product

2   independent of collecting payment from resale to an end-user customer;

3           (d)     title and the risks of ownership had not yet transferred to the

4   customer; and

5           (e)     software license maintenance, customer credits and inducement of

6   free future product were prematurely recognized as revenue.

7         161.   These accounting shenanigans resulted in the material overstatement of

8   Occam's revenues and understatement of Occam's net losses and losses per share in

9   its financial statements filed with the SEC on Forms 10-Q for the first, second and

10  third quarters of fiscal 2004, the first and third quarters of fiscal 2005, the first and

11  second quarters of fiscal 2006, and on SEC Forms 10-K for the fiscal years ended

12  December 26, 2004 ("FY 2004") and December 25, 2005 ("FY 2005").  Ultimately,

13  when Occam's various improper accounting schemes reflected in these financial

14  statements came to light, the Company was forced to restate every financial statement

15  it filed on Forms 10-Q and 10-K for fiscal years and quarters ending in 2004 and

16  2005, all three of its quarterly financial statements filed for 2006, and restate the

17  financial statements included in Occam's February 1, 2007 press release.

18        162.   GAAP are those principles recognized by the accounting profession as

19  the conventions, rules, and procedures necessary to define accepted accounting

20  practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states

21  that financial statements filed with the SEC that are not prepared in compliance with

22  GAAP are presumed to be misleading and inaccurate, despite footnotes and other

23  disclosure.  Regulation S-X requires that interim financial statements must also

24  comply with GAAP, with the exception that interim financial statements need not

25  include disclosure that would be duplicative of disclosures accompanying annual

26  disclosures, per 17 C.F.R. §210.10-01(a).

27        163.   The original representations that Occam's financial statements were

28  properly stated and a fair representation of Occam's financial condition were false and

misleading, as the financial information was neither in conformity with GAAP, nor was the financial information a "fair representation" of Occam's financial condition.

164.   The following schedule illustrates the amount by which Occam's revenues were materially overstated, the percentage of revenues overstated, the amounts by which losses were understated, and the percentage of understated losses for each misstated quarter during FY 2004, FY 2005, and FY 2006:[7]

<table>
<tr><td colspan="5" align="center">OCCAM NETWORKS, INC.:<br>MATERIALLY OVERSTATED REVENUES AND UNDERSTATED LOSSES<br>(Amounts shown in thousands of dollars except percentages)</td></tr>
<tr><td>Time Period</td><td>Overstated Revenues</td><td>Overstated Revenues Percentages</td><td>Understated Losses</td><td>Understated Loss Percentages</td></tr>
<tr><td>Q1-2004</td><td>$804</td><td>33%</td><td>$413</td><td>9%</td></tr>
<tr><td>Q2-2004</td><td>$1,018</td><td>47%</td><td>$235</td><td>4%</td></tr>
<tr><td>Q3-2004</td><td>$1,157</td><td>35%</td><td>$404</td><td>11%</td></tr>
<tr><td>Q4-2004</td><td>$1,909</td><td>42%</td><td>$617</td><td>21%</td></tr>
<tr><td>Q1-2005</td><td>$312</td><td>5%</td><td>$184</td><td>7%</td></tr>
<tr><td>Q3-2005</td><td>$347</td><td>3%</td><td>$151</td><td>5%</td></tr>
<tr><td>Q4-2005</td><td>$864</td><td>7%</td><td>$484</td><td>1181%</td></tr>
<tr><td>Q1-2006</td><td>$1,833</td><td>15%</td><td>$1,103</td><td>109%</td></tr>
<tr><td>Q2-2006</td><td>$3,373</td><td>26%</td><td>$1,402</td><td>134%</td></tr>
</table>

165.   These overstatements of revenue and understatements of net losses are not disputed.  By their restatement, *defendants have admitted that Occam made improper accounting entries to the Company's books and engaged in improper accounting schemes to prematurely recognize revenue totaling nearly $33 million*

---

[7]     Occam also misstated and restated revenues and net income in 2Q05, 3Q06 and 4Q06.  During these periods, the Company understated revenues and understated net income as follows: $1,882 and $650 in 2Q05, $2,709 and $1,401 in 3Q06, and $2,066 and $824 in 4Q06, respectively (with amounts shown in thousands of dollars).  These "net" restatements of revenue "upwards" are the result of moving revenues that were improperly recognized in previous periods into later periods.

*from fiscal 2004 to fiscal 2006, representing an astounding 27% of the $120 million in adjusted revenues during this period*.

166.   On October 16, 2007, defendants ability to hide their ongoing accounting fraud finally came to an end, and Occam announced that as a result of their improper accounting practices, Occam was forced to retroactively restate its reported or previously announced financial statements for year end 2004-2006, as detailed in Occam's SEC Form 10-K for 2006 and in the chart below:

**Occam Networks, Inc.**

**Original Reported Financial Results vs. Restated Financial Results**

| (Amounts shown in thousands of dollars except per share data and percentages) | Year Ended 12/26/04 | Year Ended 12/25/05 | Year Ended 12/31/06 | Total For Three Years Ended 12/31/06 |
|---|---|---|---|---|
| Total Revenues As Originally Reported | $17,329 | $39,238 | $68,634 | $125,201 |
| Total Revenues As Restated | $12,441 | $39,597 | 68,203 | $120,241 |
| **Overstated (Understated) Revenues** | $4,888 | ($359) | $431 | $4,960 |
| **Percent Overstated (Understated) Revenues** | 39% | -1% | 1% | 4% |
| Net Income (Loss) As Originally Reported | ($14,989) | ($7,438) | $1,515 | ($20,912) |
| Net Income (Loss) As Restated | ($16,658) | ($7,607) | $1,235 | ($23,030) |
| **(Understated Net Loss) or Overstated Net Income** | ($1,669) | ($169) | $280 | ($2,118) |
| **(Percent Understated Net Loss) or Overstated Net Income** | -10% | -2% | 23% | -9% |

167.   In addition, defendants restated each of Occam's quarterly financial statements filed with the SEC as the following table illustrates.

- 72 -

**OCCAM NETWORKS, INC. AND SUBSIDIARY**

| | Sales | Net Income (Loss) | Net Income (Loss) Attributable to common stockholders: Diluted |
|---|---|---|---|
| **Q1 2004** | | | |
| Original | $ 3,240 | $ (4,115) | $ (0.99) |
| Restated | 2,436 | (4,528) | (1.05) |
| Adjustment | (804) | (413) | (0.06) |
| **Q2 2004** | | | |
| Original | 3,185 | (5,370) | (0.89) |
| Restated | 2,167 | (5,605) | (0.92) |
| Adjustment | (1,018) | (235) | (0.03) |
| **Q3 2004** | | | |
| Original | 4,424 | (3,210) | (0.50) |
| Restated | 3,267 | (3,614) | (0.56) |
| Adjustment | (1,157) | (404) | (0.06) |
| **Q4 2004** | | | |
| Original | 6,480 | (2,294) | (0.36) |
| Restated | 4,571 | (2,911) | (0.45) |
| Adjustment | (1,909) | (617) | (0.09) |
| **Q1 2005** | | | |
| Original | 6,921 | (2,379) | (0.62) |
| Restated | 6,609 | (2,563) | (0.65) |
| Adjustment | (312) | (184) | (0.03) |
| **Q2 2005** | | | |
| Original | 8,740 | (2,535) | (0.38) |
| Restated | 10,622 | (1,885) | (0.29) |
| Adjustment | 1,882 | 650 | 0.09 |
| **Q3 2005** | | | |
| Original | 10,663 | (2,967) | (0.44) |
| Restated | 10,316 | (3,118) | (0.46) |
| Adjustment | (347) | (151) | (0.02) |
| **Q4 2005** | | | |
| Original | 12,914 | 443 | 0.07 |
| Restated | 12,050 | (41) | (0.01) |
| Adjustment | (864) | (484) | (0.08) |
| **Q1 2006** | | | |
| Original | 14,210 | 89 | (0.49) |
| Restated | 12,377 | (1,014) | (0.65) |
| Adjustment | (1,833) | (1,103) | (0.16) |
| **Q2 2006** | | | |
| Original | 16,249 | 358 | 0.02 |
| Restated | 12,876 | (1,044) | (0.15) |
| Adjustment | (3,373) | (1,402) | (0.17) |
| **Q3 2006** | | | |
| Original | 18,066 | 203 | 0.01 |
| Restated | 20,775 | 1,604 | 0.09 |
| Adjustment | 2,709 | 1,401 | 0.08 |
| **Q4 2006** | | | |
| Original | 20,109 | 865 | 0.04 |
| Restated | 22,175 | 1,689 | 0.09 |
| Adjustment | 2,066 | 824 | 0.05 |

**Occam's Restatements Establish Scienter**

168.   As a result of employing the improper accounting practices as alleged herein throughout the Class Period, Occam was ultimately forced to restate its previously released financial statements for all of 2004, 2005, and the first three quarters of 2006, and its originally announced financial results for the fourth quarter of 2006, to comply with GAAP and SEC guidance.  This Restatement was material and decreased revenues by 39% in FY 2004, understated the net loss by 10% in FY 2004, understated the net loss by 2% in FY 2005, and overstated net income by 23% in fiscal 2005.  Overall, for these three fiscal years, Occam overstated revenue by 4% and understated net losses by 9%.  On a quarter-by-quarter basis, the overstatements of revenue and understatements of losses is staggering.  Seven of the quarters during the three fiscal years had revenue overstatement percentages ranging from 7% to 47%, and loss understatement percentages ranging from 4% to 1181%.

169.   For the reasons stated below, the fact that Occam restated its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and its public statements regarding those results ***were materially false and misleading***. and (ii) the financial statements reported during the Class Period were ***incorrect based on information available to the defendants at the time the results were originally reported***.

170.   GAAP only allows a restatement of prior financial statements based upon information that existed at the time the financial statements were prepared.  Further, restatements cannot be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared.  GAAP only permits restatements of financial statements for "errors," such as an "***oversight or misuse of facts that existed at the time the financial statements were prepared***," or a change in accounting principle or a change in the reporting entity.  *See* SFAS No. 154, *Accounting Changes and Error Corrections*, "Summary," ¶¶2, 4-10, 23-26.  Occam has admitted that its restatement

was done solely to correct "errors," and not to change accounting principles or the reporting entity.   Indeed, as alleged herein, "error" correction contained in the Restatement at issue here was not due to a simple mathematical error, honest misapplication of an accounting standard or oversight; rather, as alleged herein, it was due to intentional misuse of the facts that were known at the time the previous financial statements were disseminated to the public.

171.   The SEC has recently reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, **to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter** . . . .

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, SEC Amicus Curiae Brief (S.D. Fla. Jan. 31, 2002).

172.   The restatements at issue in this case contain at least the following indicators of knowledge by defendants:

173.   **The type of restatement (misuse of the facts)** – The Restatement at issue was not due to simple mathematical error or honest misapplication of an accounting standard or oversight.  It was due to misuse of the facts.  As alleged herein, Occam knew that revenues were being recorded prematurely and without support. Despite this knowledge, Occam refused to make the required adjustments to correct the financial statements because they would have increased its net losses, adversely affected the stock price, and jeopardized its ability to secure further financing at acceptable costs.

174.   **The magnitude or size of the restatement** – This restatement was material and decreased revenues by 39% in FY 2004, understated the net loss by 10% in FY 2004, understated the net loss by 2% in FY 2005, and overstated net income by 23% in FY 2005.  While, overall, for these three fiscal years, Occam understated its net losses by at least 9%, the overstatements of revenue and understatements of losses during individual quarters is substantial.

175.   **The duration over which the improper accounting was perpetrated** – As more fully detailed herein, this is not a case of an honest mistake or oversight during a single quarter or even a single year that was realized and corrected on a good faith basis. *Occam restated three years* of financial statements to correct fraudulent accounting in 2004 through the third quarter of 2006, and to correct its announced financial results in the fourth quarter of 2006, only after the accounting shenanigans could no longer be concealed.

176.   **The types of accounting gimmicks employed** – As detailed herein, the improper accounting corrected by this restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague, or arcane accounting rules.  The accounting gimmicks used by Occam are as old, simple and fundamental as they come – namely, improper revenue recognition by failing to meet the fundamental criteria of revenue recognition, such as delivery of the goods and services and the ability to collect payment from customers.

177.   Moreover, it is more than sheer coincidence that the aggregate purported "errors" in nine of twelve of the restated quarters had the effect of inflating, not reducing, revenues, and to reducing the Company's net losses.

**All or Portions of Products and Services Bundled in Sales Transactions Had Not Been Delivered or Performed in the Quarter Revenue Was Recognized**

178.   As part of its restatement, Occam has admitted it improperly and prematurely recognized at least $9.3 million of revenue when all or portions of the products and services "sold" to certain customers had not yet been provided, but rather

1    had only been promised to be provided in the future, or were not even available at the

2    time revenue was originally recognized.  Such commitments included promises to

3    prospectively provide free product, software, training, and installation services some

4    time in the future, among other things.  For example, in one of these transactions,

5    Occam has admitted in its 2006 SEC Form 10-K to entering into a side agreement

6    with a customer to provide, as part of the sales agreement, certain post contract

7    support, software maintenance, and training, as well as certain third-party products.

8    Despite the fact that these portions of sales agreements would not be provided until

9    some future date, if at all, Occam improperly recognized all the revenue up front

10   rather than properly deferring portions of the revenue recognition on undelivered

11   portions of the sale until the products or services were actually delivered.

12       179.  Generally Accepted Accounting Principles governing revenue

13   recognition on undelivered products or unperformed services is well established.

14   AICPA Statement of Position ("SOP") 97-2, *Software Revenue Recognition*, the well

15   known 1997 accounting rule governing software and related technology revenue

16   recognition, states that, when an arrangement to provide software contains multiple

17   elements, including post-contract support, services, future upgrades and enhancements

18   or training, the fee from the sale must be allocated to the different elements:

19           If an arrangement includes multiple elements, the fee should be

20       allocated to the various elements based on vendor-specific objective

21       evidence of fair value, regardless of any separate prices stated within the

22       contract for each element.  [SOP 97-2, ¶10.]

23       180.  SOP 97-2 further requires that in the case of multiple element

24   arrangements, the portion of the revenue or fee allocated to the undelivered or

25   unperformed future services must be deferred until such delivery or services are

26   performed.

27       181.  Occam, however, flagrantly ignored these fundamental accounting rules

28   spelled out in SOP 97-2, and instead of allocating and deferring portions of revenue

1   on such transactions, it improperly recorded all the revenue immediately, regardless of

2   the fact that portions of the arrangement had not yet been met.  This cannot be

3   disputed.  In Occam's 2006 SEC Form 10-K, the Company admitted, with respect to

4   $9.3 million in revenue from FY 2004 to FY 2006, that "commitments to certain

5   customers in connection with sales for features or deliverables were not available at

6   the time revenue was originally recognized."  The Company also admitted that it was

7   required to follow SOP 97-2.

8        182.   By improperly recognizing this revenue on future undelivered portions of

9   sales agreements instead of deferring such revenue until the future products or

10  services were delivered, Occam also failed to comply with the most basic accounting

11  rules governing revenue recognition, including Securities and Exchange Commission

12  Staff Accounting Bulletin ("SAB") 104, SEC Codification of Staff Accounting

13  Bulletins, Topic 13; *Revenue Recognition*, as amended, and SAB 101, *Revenue*

14  *Recognition in Financial Statements*.  SAB 104 and the other SEC pronouncements

15  concisely and clearly state that revenue is realized or realizable and earned only if and

16  when ***all*** of the following criteria are met:

17       (a)    "Persuasive evidence of an arrangement exists," with the term

18  "arrangement" meaning the final understanding between the parties as to the specific

19  nature and terms of the agreed-upon transaction;

20       (b)     "Delivery has occurred or services have been rendered";

21       (c)    "The seller's price to the buyer is fixed or determinable"; and

22       (d)     "Collectibility is reasonably assured."

23       183.   By recognizing revenue before delivery on portions of multiple element

24  arrangements, Occam expressly violated SABs 104 and 101 and the SEC Codification

25  of Staff Accounting Bulletin, Topic 13 criterion that "[d]elivery has occurred or

26  services have been rendered" before revenue can be recognized.  Occam has since

27  admitted in its 2006 10-K that it was required to follow the SEC's guidance.

28

184.   In addition, Occam violated the overarching accounting principle that revenues and gains should not be recognized in financial statements until they are both earned and realizable (FASB Statement of Concepts ("CON") No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*:

(a)   "Revenues and gains generally are not recognized until realized or realizable.   Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash.   Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [CON 5 ¶83a]."

(b)   "Revenues are not recognized until earned.   An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [CON 5, ¶83b]."

(c)   "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [CON 5, ¶84a]."

185.   Defendants intentionally ignored these long-standing accounting rules and, in doing so, improperly recognized at least $9.3 million in revenue during 2004-2006.

**Occam's Reseller Customers Did Not Have the Ability to Pay for the Product Independent of Collecting Payment from Resale to an End-User**

186.   As part of its restatement, Occam has admitted it improperly recognized $20.2 million of revenue on purported "sales" to valued-added resellers that did ***not*** have the ability to pay Occam for these sales independent of payments to them by the resellers' end-user small customers.   In other words, Occam reported sales when cash collection for the purported sales was known to be doubtful and not assumed.   There can be no dispute that defendants knew, or were reckless in not knowing at the time

1   revenue was improperly recognized, that these resellers couldn't pay Occam, as the

2   fact that defendants restated the financial statements is a *de facto* admission that such

3   facts (in this case, that the resellers' payments were implicitly or explicitly contingent

4   upon sale to other customers) were known or knowable at the time, as accounting

5   rules only permit financial statements to be retroactively restated to correct errors that

6   existed at the time the original financial statements were prepared.  (*See* FAS 154,

7   ¶¶21, 25.)

8        187.  By improperly recognizing revenue when defendants knew or were

9   reckless in not knowing that reseller customers' payments for the products were

10  essentially contingent upon resale and collection from an end-user, Occam violated

11  the following basic GAAP and SEC guidance:

12        (a)    The collectibility criteria for revenue recognition was not met

13  under SOP 97-2, ¶30, which states that the following must be considered:

14            "Resellers are new, undercapitalized, or in financial difficulty and

15        may not demonstrate an ability to honor a commitment to make fixed or

16        determinable payments until they collect cash from their customers."

17        (b)    The criteria that contractual arrangements under which the reseller

18  is obligated to pay only as, and if, sales are made to users should be accounted for as

19  consignments.  (SOP 97-2, ¶30, footnote 7);

20        (c)    The principle that collectibility must be probable before revenue

21  may be recognized.  (SOP 97-2, ¶¶8, 115);

22        (d)    SAB 104's criterion that "[c]ollectibility is reasonably assured";

23        (e)    The principle that conservatism be used as a prudent reaction to

24  uncertainty to try to ensure that uncertainties and risks inherent in business situations

25  are adequately considered (FASB CON 2, *Qualitative Characteristics of Accounting*

26  *Information*, ¶95);

27        (f)    The principle that that revenues and gains should not be recognized

28  until they are both earned and realizable (FASB CON 5, ¶83), because the resellers

did not have the ability to pay Occam and, therefore, collectibility was clearly in doubt; and

(g)     The principle that if collectibility of assets received for products, services, or other assets is doubtful, revenues may be recognized on the basis of the cash received (FASB CON 5, ¶84g) – given that Occam did not receive cash for the $20.2 million of revenue when it was originally recognized.

**Occam Improperly Recognized Revenue on Software License Maintenance, Customer Credits and Inducement of Free Future Profit**

188.   In yet another example of improper accounting, as part of its restatement Occam has admitted it improperly recognized $1.1 million of revenue when Occam did ***not*** properly account for software and software maintenance, customer credits, and undelivered free product.  In essence, these purported sales were improper because Occam booked revenues for goods and services that the Company didn't deliver, and Occam did not properly take certain post-contract customer support ("PCS") obligations into account.  Occam failed to properly recognize revenue by violating SAB 104's criterion that "[d]elivery has occurred or services have been rendered." Occam violated the principle that revenues and gains should not be recognized until they are both earned and realizable (FASB CON 5, ¶83).  Occam also violated the principle that revenue should not be recognized before delivery applies whether the customer is a user or reseller (SOP 97-2, ¶18).  In addition, Occam's admission that it did not properly account for software maintenance was tantamount to an admission that it failed to follow the requirement that an obligation to perform PCS is incurred at the inception of a PCS arrangement and is discharged by delivering unspecified upgrades/enhancements, performing services, or both over the period of the PCS arrangement (SOP 97-2, ¶124).

**Occam Improperly Recognized Revenue Before Title and Ownership of Products Passed to Customers**

189.   As part of its restatement, defendants have admitted that Occam improperly recognized $2.3 million of improper revenue because the terms and

conditions of certain shipments did *not* transfer title or risk of loss at the time of shipments.  Occam improperly tried to squeeze in revenues during certain quarters ending on weekends by loading product with an interim "shipper" until the following week when the product would be given to the actual shipper to deliver to the customer after the quarter had closed.  The Uniform Commercial Code provides that –unless a contrary agreement is explicitly made – title passes to the buyer at the time the goods are physically delivered to the buyer.  Title did not pass to the customers for these purported sales and Occam failed to make good delivery because the "shipments" were, in essence, warehoused with the interim shipper if the last day of the quarter fell on a weekend until the actual shipper could belatedly take custody during the next weekday.  Thus, delivery had not occurred in the quarter revenue was recognized. Occam violated GAAP and SEC guidance as follows:

(a)    The principle that revenue should not be recognized before delivery applies whether the customer is a user or reseller (SOP 97-2, ¶18);

(b)    SAB 104's criterion that "[d]elivery has occurred or services have been rendered"; and

(c)    The principle that revenues and gains should not be recognized until they are both earned and realizable (FASB CON 5, ¶83).

**Occam's Financial Statements Violated Fundamental Concepts of GAAP and SEC Guidance**

190.    In addition the above referenced departures from GAAP and SEC guidance, as a result of the defendants' accounting improprieties, Occam presented its financial results in a manner that violated GAAP and SEC guidance, including the following fundamental accounting principles and SEC guidance:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶95);

(h)     The principle that that revenues and gains should not be recognized until they are both earned and realizable (FASB Statement of Concepts No. 5, ¶83); and

(i)     The principle that if collectibility of assets received for products, services, or other assets is doubtful, revenues may be recognized on the basis of the cash received (FASB Statement of Concepts No. 5, ¶84).

## THE ACCOUNTANTS' PARTICIPATION IN THE SCHEME

191.   PwC's Los Angeles office and Singer Lewak were engaged to examine and report on Occam's financial statements for fiscal years 2004-2006, to perform review services on Occam's interim FY 2004 through FY 2006 quarterly results, and to provide consulting, tax and other services related to Occam's SEC filings, including comfort letters, consents and comment letters.  PwC's and Singer Lewak's unqualified opinions were also included in Occam's 2006 Registration Statement and Prospectus. As a result of the far-reaching scope of services provided by these accountants, personnel were intimately familiar with Occam's business, including Occam's revenue recognition practices.

192.   These auditors participated in the wrongdoing alleged herein in order to retain Occam as a client and to protect the fees it expected to receive from Occam. Each firm enjoyed a lucrative business relationship with Occam's senior management for which it has received hundreds of thousands, if not millions of dollars in fees for auditing, consulting and tax services over the years.  These fees were particularly important to the partners in PwC's Los Angeles office and at Singer Lewak as their incomes were dependent on the continued business from Occam.

**PwC's and Singer Lewak's False Statements as to Occam's Financial Statements**

193.   Both PwC and Singer Lewak falsely represented that Occam's financial statements for FY 2004-2006 were presented in accordance with GAAP and that their annual audits of Occam' s financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS").  PwC and Singer Lewak also consented to the incorporation of their false reports on Occam's financial statements into Occam's Form S-1/A which was filed with the SEC in October 2006.  These

- 84 -

1 accountants' issuance of materially false reports on Occam's FY 2004-2006 financial

2 statements was by itself a violation of GAAS.

3   194.   The SEC has stressed the importance of meaningful audits being

4 performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence
> of investors in financial reporting.  An investor's willingness to commit
> his capital to an impersonal market is dependent on the availability of
> accurate, material and timely information regarding the corporations in
> which he has invested or proposes to invest.  The quality of information
> disseminated in the securities markets and the continuing conviction of
> individual investors that such information is reliable are thus key to the
> formation and effective allocation of capital.  ***Accordingly, the audit
> function must be meaningfully performed and the accountants'
> independence not compromised***.

15 *Relationships Between Registrants and Independent Accountants*, SEC Accounting

16 Series Release No. 296, 1981 SEC LEXIS 858, at *8-*9 (Aug. 20, 1981).

17   195.   GAAS, as approved and adopted by the American Institute of Certified

18 Public Accountants ("AICPA"), relate to the conduct of individual audit engagements.

19 Statements on Auditing Standards (codified and referred to as "AU") are recognized

20 by the AICPA as the interpretation of GAAS.

21   196.   With respect to Occam's financial statements for fiscal year-end

22 December 31, 2004, PwC represented, in a report dated March 25, 2005, included in

23 the Company's 2004 SEC Form 10-K, the following:

> To the Board of Directors and Stockholders of Occam Networks,
> Inc.
>
> ***In our opinion, the accompanying consolidated balance sheets
> and the related consolidated statements of operations, stockholders'
> equity (deficit) and cash flows present fairly, in all material respects,***

- 85 -

*the financial position of Occam Networks, Inc. and its subsidiaries (the "Company") at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America*. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 1, the Company has incurred significant operating losses and negative cash flows from operations since inception. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regards to these matters are also described in Note 1. the accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/PRICEWATERHOUSECOOPERS LLP
March 25, 2005
Los Angeles, California

197.    PwC also signed off on and approved a number of Occam's quarterly financial results prior to their issuance to the public during the Class Period. According to Occam's 2005 Proxy Statement, the audit fees billed by PwC in connection with FY 2004 were for the audits of the consolidated financial statements, statutory audits and timely quarterly reviews.  Additionally, PwC signed off on and approved Occam's quarterly financial reports for the first and second quarters of 2005.

198.    PwC's March 25, 2005 report was false and misleading due to its failure to comply with GAAS and because Occam's financial statements were not prepared in conformity with GAAP, as alleged in detail above, so that issuing the report was in violation of GAAS and SEC rules.  PwC knew its report would be relied upon by the Company as well as by present and potential investors in Occam's stock.

199.    According to a filing by Occam, on June 22, 2005, the Company "dismissed" PwC and replaced it with Singer Lewak.  No reason was given for the change in auditors in mid-year 2005 – such an event is unusual.

200.    With respect to Occam's financial statements for fiscal year-end December 31, 2005, Singer Lewak represented, in a report dated March 10, 2006, included in the Company's 2005 10-K/A, the following:

> We have audited the consolidated balance sheet of Occam Networks, Inc. and subsidiary (collectively, the "Company") as of December 25, 2005 and the related consolidated statements of operations, stockholders' deficit and cash flows for the year then ended. These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audit.

- 87 -

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provided a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Occam Networks, Inc. and subsidiary as of December 25, 2005, and the results of their operations and their cash flows for the year then ended in conformity with U.S. generally accepted accounting principles*.

/s/SINGER LEWAK GREENBAUM & GOLDSTEIN LLP
Los Angeles, California
March 10, 2006

201.   Singer Lewak also signed off on and approved a number of Occam's quarterly financial results prior to their issuance to the public during the Class Period. In connection with fiscal year 2005, Singer Lewak performed audits of the consolidated financial statements, statutory audits and timely quarterly reviews. Additionally, Singer Lewak signed off on and approved Occam's quarterly financial reports for all four quarters of 2006.

202.   PwC's March 25, 2005 report was false and misleading due to its failure to comply with GAAS and because Occam's financial statements were not prepared in conformity with GAAP, as alleged in detail above, so that issuing the report was in

1  violation of GAAS and SEC rules.  Singer Lewak knew its report would be relied

2  upon by the Company as well as by present and potential investors in Occam's stock.

3  **PwC and Singer Lewak Ignored the Audit Evidence It Gathered**

4  203.   GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to

5  obtain sufficient competent evidential matter through inspection, observation,

6  inquiries and confirmations to afford a reasonable basis for an opinion regarding the

7  financial statements under audit:

8  In evaluating evidential matter, the auditor considers whether

9  specific audit objectives have been achieved.  The independent auditor

10  should be thorough in his or her search for evidential matter and

11  unbiased in its evaluation.  In designing audit procedures to obtain

12  competent evidential matter, he or she should recognize the possibility

13  that the financial statements may not be fairly presented in conformity

14  with generally accepted accounting principles or a comprehensive basis

15  of accounting other than generally accepted accounting principles.  In

16  developing his or her opinion, the auditor should consider relevant

17  evidential matter regardless of whether it appears to corroborate or to

18  contradict the assertions in the financial statements.  To the extent the

19  auditor remains in substantial doubt about any assertion of material

20  significance, he or she must refrain from forming an opinion until he or

21  she has obtained sufficient competent evidential matter to remove such

22  substantial doubt, or the auditor must express a qualified opinion or a

23  disclaimer of opinion.

24  AU §326.25.

25  204.   PwC's and Singer Lewak's responsibility as Occam's independent

26  auditors, was to obtain "[s]ufficient competent evidential matter . . . to afford a

27  reasonable basis for an opinion regarding the financial statements under audit" as to

28  "the fairness with which they present, in all material respects, financial position,

results of operations, and its cash flows in conformity with generally accepted accounting principles."  AU §§110.01, 150.02.

205.   In violation of GAAS, and contrary to the representations in their reports on Occam's financial statements, PwC and Singer Lewak did not obtain sufficient, competent, evidential matter to support Occam's assertions regarding Occam's accounting for its revenue recognition.

**PwC and Singer Lewak Failed to Design Their Audits to Identify the Alleged Improprieties**

206.   As large audit firms, PwC and Singer Lewak were well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, these accountants knew of the audit risks inherent at Occam and in the industries in which Occam operated because of the comprehensive services they provided to Occam and their experience with many other clients in the telecommunications industry.  In connection with Occam's operations, the accountants had virtually limitless access to information concerning the Company's true operations as:

- PwC had been Occam's auditor since at least 2002;
- PwC and Singer Lewak were present at Occam's headquarters and divisions frequently during the Class Period;
- PwC provided Occam with substantial non-audit services;
- PwC and Singer Lewak had frequent conversations with Occam management and employees about the Company's operations and financial statements;
- PwC and Singer Lewak audited and reviewed Occam's financial statements during the Class Period and knew or should have known that Occam's financial statements were not accurate or prepared in compliance with GAAP or GAAS.

- In 2003 and 2004, PwC had openly questioned Occam's ability to continue as a "going concern" based on its inability to earn a profit or obtain financing.

- In or about March 2005 PwC noted that Occam suffered from material weaknesses and internal control deficiencies.

- The Company permitted PwC to discuss its 2005 internal control deficiencies findings with Singer Lewak.

207. PwC's and Singer Lewak's intentional failure to comply with GAAS in performance on the Occam audits rose to the level of deliberate recklessness. The accountants abandoned their role as independent auditors by turning a blind eye to each of the above indications of improper accounting, including Occam's accounting for its revenue recognition, and the material weaknesses in the Company's internal controls, especially as they related to accounting for and reporting revenue. Despite this knowledge, the auditors did not insist upon adjustments to Occam's audited financial statements. Pursuant to GAAS, PwC and Singer Lewak should have issued a qualified or adverse report, or they should have insisted that Occam comply with GAAP.

208. Statement on Auditing Standards ("SAS") 99 identifies risk factors relating to misstatements arising from fraudulent financial reporting:

(a) Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend;

(b) A practice by management of committing to analysts, creditors, and other third parties to achieve aggressive or unrealistic forecasts;

(c) Management compensation being contingent upon achieving aggressive targets for stock price, operating results, financial position, or cash flow;

(d) Management failing to correct known reportable conditions on a timely basis;

1    (e)    Need to obtain additional debt or equity financing to stay

2    competitive;

3    (f)    Ineffective board of directors or audit committee oversight over the

4    financial reporting process and internal control;

5    (g)    Internal control components are deficient; and

6    (h)    Marginal ability to meet exchange listing requirements.

7    209.    Given the presence of these fraud risk factors, SAS 99 recommends that

8    auditors should consider the following actions, all of which are designed to uncover

9    the exact types of fraud present at Occam:

10    (a)    Confirming with customers certain relevant contract terms and the

11    absence of side agreements, because the appropriate accounting often is influenced by

12    such terms or agreements.  For example, acceptance criteria, delivery and payment

13    terms, the absence of future or continuing vendor obligations, the right to return the

14    product, guaranteed resale amounts, and cancellation or refund provisions often are

15    relevant in such circumstances.

16    (b)    Inquiring of the entity's sales and marketing personnel or in-house

17    legal counsel regarding sales or shipments near the end of the period and their

18    knowledge of any unusual terms or conditions associated with these transactions.

19    (c)    Being physically present at one or more locations at period end to

20    observe goods being shipped or being readied for shipment (or returns awaiting

21    processing) and performing other appropriate sales and inventory cutoff procedures.

22    (d)    For those situations for which revenue transactions are

23    electronically initiated, processed, and recorded, testing controls to determine whether

24    they provide assurance that recorded revenue transactions occurred and are properly

25    recorded.  (SAS 99, ¶54.)

26    210.    PwC and Singer Lewak did not adequately consider the risk factors

27    relating to misstatements arising from fraudulent financial reporting and, in fact,

28    turned a blind eye to them.  Further, had they performed the above audit procedures

recommended in SAS 99, it was highly likely that they would have discovered the pervasiveness of Occam's fraudulent accounting revenue recognition schemes that they had previously identified in letters to Occam's Board of Directors in 2005 and 2006.

211.   PwC and Singer Lewak failed to adequately perform their audit procedures to identify the improprieties alleged herein and their failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of three years, leading to false and misstated financial statements.

212.   In the course of their audits and reviews of the Company's financial results, processes and procedures, and internal controls, PwC and Singer Lewak knew, or were reckless in not knowing, that Occam and its executives and directors were causing the Company to improperly recognize revenue and otherwise engage in fraudulent conduct.  More specifically, these defendants encountered numerous "red flags" that warned the auditors that fraud may be afoot, requiring further inquiry, testing and substantiation.  These red flags included:

- Occam was a small, under-funded company that was required to repeatedly seek capital investments in order to continue as a going concern;

- Occam had never earned a profit;

- Occam competed in the extremely competitive telecommunications industry, an industry that had recently been scandalized by numerous egregious accounting frauds like Qwest and WorldCom;

- Most of Occam's directors did not satisfy "independence" requirements of the major stock markets and the SEC;

- Two of Occam's Audit Committee members suffered from debilitating conflicts of interest and were beholden to venture capital funds;

- • As a small company not listed on a major exchange, it was not required to satisfy all of the Sarbanes-Oxley Act of 2002 requirements for publicly traded companies;

- • In 2003 and 2004 PwC had noted its concern that the Company may not be able to continue as a "going concern";

- • In or about March 2005, PwC identified a material weakness and internal control deficiencies with respect to the Company's revenue recognition and financial reporting practices, including issues that dated as far back as Q2 2004; and

- • The obviousness of the revenue recognition overstatements as indicated by their sheer size and unrelenting frequency over the three-year span.

213.   PwC and Singer Lewak consciously disregarded these badges of fraud, in violation of their duties as public accountants to the Company and its shareholders. By permitting the fraudulent conduct to continue, and putting their imprimatur on the false and misleading financial statements herein, these auditors are liable for their own violations of the Federal Securities laws.

214.   Despite PwC's and Singer Lewak's "clean" audit reports during the Class Period, Occam has now restated $33 million in improperly recognized revenue during the Class Period for which PwC and Singer Lewak served as the Company's public accountants.   For a company the size of Occam, these amounts are substantial and material – making up over 27% of the Company's $120 million in revenues for the entire period.

**PwC's and Singer Lewak's Audits Violated Fundamental Concepts of GAAS**

215.   PwC's and Singer Lewak's failure to adequately perform their audit procedures to identify the improprieties alleged herein and their failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of three years, leading to false and misstated financial statements.  Due to the

accountants' false statements and failure to identify and modify their reports to identify Occam's false financial reporting, they violated the following GAAS standards:

(a) The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

(b) The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

(c) The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

(d) The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

(e) The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(f) The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

(g) The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

(h) The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

(i) The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

(j) The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

**CLASS ACTION ALLEGATIONS**

216.   Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the

publicly traded common stock of Occam between April 29, 2004 and October 16, 2007, inclusive (the "Class"), including those who purchased stock in or traceable to Occam's November 7, 2006 Offering.

217.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, if not thousands of members of the Class located throughout the United States.  Occam has approximately 19.7 million shares of common stock outstanding traded on the NASDAQ, a national market.

218.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation, and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the class that plaintiff seeks to represent.

219.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

220.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)    whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

1   (c) whether defendants participated directly or indirectly in the course

2 of conduct complained of herein; and

3   (d) whether the members of the Class have sustained damages and the

4 proper measure of such damages.

5      **FRAUD-ON-THE-MARKET DOCTRINE**

6   221. At all relevant times, the market for Occam's common stock was an

7 efficient market for the following reasons, among others:

8   (a) The Company's common stock was actively traded in a highly

9 efficient market;

10   (b) As a regulated issuer, the Company filed periodic public reports

11 with the SEC;

12   (c) The Company was covered regularly by securities analysts; and

13   (d) The Company regularly issued press releases, which were carried

14 by national news wires and over the internet.  Each of these releases, was publicly

15 available and entered the public marketplace.

16   222. As a result, the market for the Company's common stock promptly

17 digested current information with respect to Occam from all publicly available sources

18 and reflected such information in the price of the Company's securities.  Under these

19 circumstances, all purchasers of the Company's common stock during the Class

20 Period suffered similar injury through their purchase of the common stock of Occam

21 at artificially inflated prices and a presumption of reliance applies.

22      **FIRST CLAIM FOR RELIEF**

23     **For Violation of §11 of the Securities Act**

24  **Against All Defendants Except Bailey and the VCF Defendants**

25   223. Plaintiff repeats and realleges each and every allegation contained above.

26   224. This count is brought pursuant to §11 of the Securities Act, 15 U.S.C.

27 §77k, on behalf of all persons who received Occam stock issued in or traceable to the

28 November 7, 2006 Offering (the "Offering"), against all defendants.

225.   As set forth above in ¶¶154-156, the Registration Statement for Occam's Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

226.   The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

227.   Occam was the registrant for the securities issued in the Offering, and as one of the issuers of the Occam shares issued in the Offering is strictly liable to plaintiff and the Class for the misstatements and omissions.

228.   Each of the Individual Defendants named herein signed the Registration Statement.  Each of them was either an executive officer or director for the Company at the time it became effective.  The Individual Defendants named herein are therefore liable pursuant to §§11(a)(1) and 11(a)(2), 15 U.S.C. §77k (a)(1) and (2).

229.   In connection with Occam's Offering, the Accountant Defendants, with their consent, were named by Occam as having prepared and certified Occam's 2004 and 2005 financial statements.  With Singer Lewak's knowledge and permission, the false and misleading 2005 and 2006 financial statements were incorporated into the Registration Statement and Prospectus.  With PwC's knowledge and permission the false and misleading 2004 financial statements were incorporated into the Registration Statement and Prospectus.  As a result, the Accountant Defendants are liable pursuant to §11(a)(4), 15 U.S.C. §77k(a)(4).

230.   The Underwriter Defendant issued, caused to be issued, and participated in the issuance of the materially false and misleading Registration Statement.  The Underwriter Defendant acted as an "underwriter" for the November 2006 Offering and is liable pursuant to 15 U.S.C. §77k(a)(5).  This claim against the Underwriter Defendant is based only on theories of strict liability and negligence.  It is not predicated on any allegation that Thomas Weisel engaged in fraudulent conduct.

231.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

232.   Plaintiff and the Class acquired Occam shares pursuant to the false and misleading Registration Statement and Prospectus.

233.   Plaintiff and the Class have sustained damages.  The value of Occam common stock has declined substantially subsequent to, and due to defendants' violations.

234.   At the times it purchased Occam shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to October 15, 2007.  Less than one year has elapsed from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed between the time that the securities upon which this count is brought were offered to the public and the time plaintiff filed this Complaint.

## SECOND CLAIM FOR RELIEF

**For Violation of §15 of the Securities Act Against All Defendants Except Occam Networks, Bailey, PwC, Singer Lewak and Thomas Weisel**

235.   Plaintiff repeats and realleges each and every allegation contained above.

236.   This count is brought pursuant to §15 of the Securities Act against all defendants except the Company, Bailey, PwC, Singer Lewak and Thomas Weisel.

237.   Each of the named Individual Defendants was a control person of Occam by virtue of his position as a director and/or senior officer of Occam, and their power to control Occam's corporate actions and the transactions, and public statements alleged herein.  The Individual Defendants also each had a series of direct and/or

1 indirect business and/or personal relationships with other directors and/or officers
2 and/or major shareholders of Occam.

3      238.   Each of the VCF defendants was a control person of Occam by virtue of
4 the fact that each controlled a general/managing partner who simultaneously held
5 positions as a director of Occam, and their power to control Occam's corporate actions
6 and the transactions and public statements alleged herein.  By virtue of the fact that
7 directors of Occam's board were also general/managing partners of these VCFs with
8 fiduciary duties owed to them and their partners, and by the fact that these groups
9 were major shareholders of Occam and owned a controlling percentage of the
10 Company, the VCF defendants also each had a series of direct and/or indirect business
11 and/or personal relationships with other directors and/or officers and/or major
12 shareholders of Occam that permitted them to exercise control over the Company and
13 the content of the Registration Statement and Prospectus, as described herein.

14      239.   Each of the Individual Defendants named herein, and VCF defendants
15 was a culpable participant in the violation of §11 of the Securities Act alleged in
16 Count 1 above, based on the former having signed the Registration Statement and
17 having otherwise participated in the process which allowed the Offering to be
18 successfully completed.

19                          **THIRD CLAIM FOR RELIEF**

20      **Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated**
       **Thereunder Against All Defendants Except PwC, Singer Lewak, the VCF**
21                     **Defendants and Thomas Weisel**

22      240.   Plaintiff repeats and realleges each and every allegation contained above
23 as if fully set forth herein.

24      241.   During the Class Period, Defendants Occam, PwC, Singer Lewak,
25 Individual Defendants Howard-Anderson, Bailey, Farrell, Krausz and Abbott carried
26 out a plan, scheme and course of conduct which was intended to and, throughout the
27 Class Period, did: (i) deceive the investing public, including plaintiff and other class
28 members, as alleged herein; and (ii) cause plaintiff and other members of the Class to

1   purchase Occam's common stock at artificially inflated prices.  In furtherance of this
2   unlawful scheme, plan and course of conduct, defendants, and each of them, took the
3   actions set forth herein.

4       242.   Defendants named in this claim for relief (a) employed devices, schemes,
5   and artifices to defraud; (b) made untrue statements of material fact and/or omitted to
6   state material facts necessary to make the statements not misleading; and (c) engaged
7   in acts, practices and a course of business which operated as a fraud and deceit upon
8   the purchasers of the Company's common stock in an effort to maintain artificially
9   high market prices for Occam's common stock in violation of §10(b) of the Exchange
10  Act and Rule 10b-5.   These defendants are sued as primary participants in the
11  wrongful and illegal conduct charged herein.

12      243.   Defendants, individually and in concert, directly and indirectly, by the
13  use, means or instrumentalities of interstate commerce and/or of the mails, engaged
14  and participated in a continuous course of conduct to conceal adverse material
15  information about the business, operations and future prospects of Occam as specified
16  herein.

17      244.   These defendants employed devices, schemes and artifices to defraud,
18  while in possession of material adverse non-public information and engaged in acts,
19  practices, and a course of conduct as alleged herein in an effort to assure investors of
20  Occam's value and performance and continued substantial growth, which included the
21  making of, or the participation in the making of, untrue statements of material facts
22  and omitting to state material facts necessary in order to make the statements made
23  about Occam and its business operations and future prospects in the light of the
24  circumstances under which they were made, not misleading, as set forth more
25  particularly herein, and engaged in transactions, practices and a course of business
26  which operated as a fraud and deceit upon the purchasers of Occam common stock
27  during the Class Period.

28

245.   These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Occam's true operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the company's business, operations and earnings throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

246.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Occam's common stock was artificially inflated during the Class Period in ignorance of the fact that market prices of Occam's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Occam common stock during the Class Period at artificially high prices and were damaged thereby.

247.   At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true, had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Occam was experiencing, which were not disclosed by

1    defendants, plaintiff and other members of the Class would not have purchased or

2    otherwise acquired their Occam common stock, or, if they had acquired such common

3    stock during the Class Period, they would not have done so at the artificially inflated

4    prices which they paid.

5        248.   By virtue of the foregoing, these defendants violated §10(b) of the

6    Exchange Act, and Rule 10b-5 promulgated thereunder.

7        249.   As a direct and proximate result of these defendants' wrongful conduct,

8    plaintiff and the other members of the Class suffered damages in connection with their

9    respective purchases and sales of the Company's common stock during the Class

10   Period.

11                             **FOURTH CLAIM FOR RELIEF**

12   **Violation of §20(a) of the Exchange Act Against All Defendants Except Occam
     Networks, PwC, Singer Lewak and Thomas Weisel**

13

14       250.   Plaintiff repeats and realleges each and every allegation contained above

15   as if fully set forth herein.

16       251.   Defendants Howard-Anderson, Bailey, Farrell, Krausz, Abbott and the

17   VCF Funds acted as controlling persons of Occam within the meaning of §20(a) of the

18   Exchange Act as alleged herein.  By virtue of their high-level positions, and their

19   ownership and contractual rights, participation in and/or awareness of the Company's

20   operations and/or intimate knowledge of the false financial statements filed by the

21   Company with the SEC and disseminated to the investing public, the Individual

22   Defendants named herein, and VCF defendants had the power to influence and control

23   and did influence and control, directly or indirectly, the decision-making of the

24   Company, including the content and dissemination of the various statements which

25   plaintiff contends are false and misleading.  In particular, each of these defendants had

26   direct and supervisory involvement in the day-to-day operations of the Company and

27   had the power to control or influence the particular transactions giving rise to the

28   securities violations as alleged herein.

252.   As set forth above, Occam and Defendants Howard-Anderson, Bailey, Farrell, Krausz and Abbott each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding plaintiffs and the members of the Class damages, including interest;

C.   Awarding plaintiffs reasonable costs and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 16, 2008

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
ANDREW J. BROWN
MATTHEW I. ALPERT
ERIC I. NIEHAUS

ANDREW J. BROWN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

- 104 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CAVANAGH & O'HARA
WILLIAM K. CAVANAGH, JR.
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiff

S:\CasesSD\Occam Networks\CPT00052480_1ST AMD.doc

<u>DECLARATION OF SERVICE BY FEDERAL EXPRESS DELIVERY</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on July 16, 2008, declarant served by Federal Express, next day delivery, the **FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  16th day of July, 2008, at San Diego, California.

CHRISTINE CLARK

- 106 -

OCCAM NETWORKS (LEAD)
Service List - 7/16/2008    (07-0137)
Page 1 of 2

### Counsel For Defendant(s)

Grant P. Fondo
Cooley Godward Kronish LLP
Five Palo Alto Square, 3000 El Camino Real
Palo Alto, CA 94306-2155
  650/494-7622
  650/857-0663 (Fax)

Efren A. Compean
Garrett & Tully, P.C.
225 South Lake Avenue, Suite 1400
Pasadena, CA 91101
  626/557-9500
  626/577-0813 (Fax)

Scott A. Fink
Gibson, Dunn & Crutcher LLP
One Montgomery Street
26th Floor, Telesis Tower
San Francisco, CA 94104
  415/393-8200
  415/986-5309 (Fax)

Sally J. Berens
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304
  650/849-5300
  650/849-5333 (Fax)

Stephen A. Scott
Hayes Davis Bonino Ellingson McLay & Scott
203 Redwood Shore Pkwy, Suite 480
Redwood Shores, CA 94065
  650/486-2867
  650/637-8071 (Fax)

Philip T. Besirof
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
  415/268-7000
  415/268-7522 (Fax)

OCCAM NETWORKS (LEAD)
Service List - 7/16/2008    (07-0137)
Page 2 of  2

Marta B. Arriandiaga
Ropers Majeski Kohn & Bentley, P.C.
515 South Flower Street, Suite 1100
Los Angeles, CA  90071
   213/312-2000
   213/312-2001 (Fax)

Gregory L. Watts
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA  94304-1050
   650/493-9300
   650/493-6811 (Fax)

**Counsel For Plaintiff(s)**

William K. Cavanagh, Jr.
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL  62701
   217/544-1771
   217/544-9894 (Fax)

Darren J. Robbins
Andrew J. Brown
Tricia L. McCormick
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)